1828.

James
v.
Hubbard.

---

[*228]

## *JAMES v. HUBBARD AND OTHERS.

Where certain lands upon which a judgment is a lien are advertised for sale under such judgment, part of which lands have been previously sold by the debtor, and there are other lands of the debtor unsold, but the lien of the judgment would expire before such other lands could be advertised and sold, the owner of the judgment in such case, would not be bound upon the requisition of the purchaser from the debtor to abandon the sale of the lands so advertised.

The proper course of such purchaser would be to offer to pay the amount of such judgment and to take an assignment of the same; and then by filing a bill against all the parties in interest before the expiration of the lien of the judgment, it seems such purchaser would be able to preserve the lien so far as to compel contribution upon equitable principles.

A judgment creditor cannot enforce his judgment against the land of a subsequent purchaser, so long as there are other lands of the debtor sufficient to satisfy the judgment.

Where there are successive purchasers there is no contribution, and their lands are chargeable with the judgment against the debtor in the inverse order of alienation; that is, the last sold are to be first charged.[1]

In such cases the equities between the several purchasers are equal, yet the first purchaser, having the prior equity, is preferred.

The priority of equity is not determined by the date of the conveyance, but by the contract for the purchase of the land and the payment for the same.

A judgment creditor is not bound to decide at his peril upon the equitable rights of the owners of different portions of the land upon which he has a lien.

If the land of the purchaser who has a prior equity is first sold, he can compel the other purchasers to refund to him the amount they were benefited by such sale.

If a judgment creditor discharges from the lien of his judgment a part of the lands which ought to be first resorted to, the owner of other parts of the lands who has a prior equity will be entitled to a deduction from the judgment of the value of the lands so discharged, before his lands are resorted to for the satisfaction of such judgment.

1828.

James
v.
Hubbard.

ON the 4th of December, 1815, Jacob Tuckerman gave October 21st. to the defendant Hubbard, a bond and warrant to secure the payment of $1,020 and interest; on which a judgment was entered in the Supreme Court on the 15th of the same month. And by a written agreement of Tuckerman, the execution *was to be issued at any time, without the necessity of reviving the judgment by *scire facias*. On the 25th of December, 1816, a part of the lands of Tuckerman, which were subject to the lien of the judgment, were sold by him to George Dudley; and the complainant afterwards obtained title to the same by purchase under an execution against Dudley. On the 14th of February, 1817, Tuckerman conveyed to J. G. Curtis one-tenth, and to James McConnell two-tenths of ten acres; on the 28th of March, 1817, to D. Blakesley twenty-one acres; on the 16th of November, 1817, to J. N. Reynolds half an acre and fourteen and a half rods; on the 13th of May, 1818, to

[*229

[1] *Crafts* v. *Aspinwall,* 2 Comst. 289; 2 R. S. (4th ed.) 625, secs. 92, 93.

1828.

James
v.
Hubbard.

John Edgerton, three acres; on the 22d of July, 1818, to Elijah Philleo about half an acre, and another piece containing about one hundred and three acres and three-fourths; and on the 9th of July, 1819, seventy-nine and a half acres of land to Jesse Blodget, all of which lands were in the county of Madison. Tuckerman had another piece of land in Bridgewater, Oneida County, which was under a mortgage for the purchase-money; which mortgage has been subsequently foreclosed in Chancery. Hubbard also held a junior mortgage on the Bridgewater lot. In October, 1825, he caused an execution to be issued on his judgment to the sheriff of Madison, and directed J. G. Stower, his agent, to ascertain what lands were bound by the judgment, and to have the same advertised and sold. On the 25th of October, the sheriff advertised the above-mentioned lands in that county to be sold on the 6th of December then next. On the 25th of November, 1825, James procured a judge's order, staying all proceedings on the execution, for the purpose of enabling him to apply to the Supreme Court for directions to the sheriff as to the order of sale. This order was subsequently revoked, on the ground that the lien of the judgment would expire before the next term of the court; and the sale was adjourned, by direction of Stower, until the 10th of December, which, it was then supposed, was the day previous to the expiration of the lien of the judgment. On the 6th of December, 1825, the agent of the complainant informed Stower he should require that the *lands be sold in the inverse order of their alienation. At the time of the sale the complainant's agent gave a written notice to the sheriff, stating the order of alienation, which was correct, (except as to the date of two of the deeds, which did not alter the order of alienation,) and requiring that the lands should be sold in the inverse order of such alienation. He also gave notice to the sheriff that the judgment was a lien upon lands in Bridgewater, Denmark, and in Willsborough, in the county of Essex, and forbidding the sale of the lands advertised, until those lands

[*230]

should be first sold under the judgment. He also offered to bid on the lands aliened after the deed to Dudley the full amount due on the execution. After the pieces of land conveyed to Blodget, Edgerton, Blakesley, and the first piece conveyed to Philleo had been sold and bid in by the complainant's agent, Lockert Berry, the owner of the second piece conveyed to Philleo, claimed to have it exempted from the sale, and gave a written indemnity to the agent of Hubbard; whereupon Stower directed the sheriff to sell the lot conveyed to Dudley, and the same was bid in for Hubbard at $950. Berry died in January, 1826.

On the 8th of September, in the same year, the complainant filed his bill in this cause against the sheriff and Hubbard and against the heirs of Berry, stating substantially the above facts, and also charging that the judgment of Hubbard was never due, or that it had been satisfied, and was kept up by fraud, for the purpose of charging the lands which had been conveyed by Tuckerman; and also charging that the latter had lands in Bridgewater, Denmark and Willsborough, which ought to be first subjected to the lien of the judgment, and praying that Hubbard might be decreed to give up the sheriff's certificate; that the sale of the complainant's lot might be declared void, and the sheriff enjoined from giving a deed, and for general relief.

The defendant put in his answer, denying all fraud, and fully explaining his transactions with Tuckerman; showing the judgment unsatisfied, except $13, which, through mistake, he had omitted to credit; and showing a large balance due to him from Tuckerman, over and above the judgment; *also showing the foreclosure and sale of the Bridgewater lands under an old mortgage to L'Hommedieu; and denying, that to his knowledge or belief, there were any lands in Denmark or Willsborough subject to the lien of the judgment; admitting that Stower was his agent in relation to the execution, but denying all knowledge of the order of alienation of the lands at the time of sale, except so far as the information was conveyed to Stower and

1828.

James
v.
Hubbard.

[*231]

the sheriff at the time of sale; and admitting, substantially, all the other facts, but alleging that the title of Tuckerman to the Berry farm was doubtful at the time of the sale, and that a recovery was had against the claimants of other lands held under the same title, which verdict was set aside on account of some formal defect in taking the testimony under a commission only.

A part of the heirs of Berry, who were infants, put in a general answer by their guardian, and the bill was taken *pro confesso* against the other defendants.

*J. King* & *J. V. Henry*, for complainant:—The lots of land subject to the judgment of Hubbard ought to have been sold in the inverse order of their alienation by Tuckerman, the debtor. (*Clowes* v. *Dickinson*, 5 John. Ch. R. 235; *Gill* v. *Lyon*, 1 John. Ch. R. 447; *Lanoy* v. *The Duke* & *Dutchess of Athol*, 2 Atk. R. 446; *Evertson* v. *Booth*, 19 John. R. 491; *Galatian* v. *Erwin and others*, 1 Hop. R. 49; *Hays* v. *Ward*, 4 John. Ch. R. 123.) The complainant has not lost his right of having the lots sold in the inverse order of their alienation by neglecting to apply to the court before the sale. All the complainant was bound to do, was to require the sheriff at the sale to sell in the order settled in equity; leaving the owners to ascertain such order among themselves. When the request was made to do equity, if any objection existed as to title or otherwise the judgment creditor should then have stated it.

*G. C. Bronson*, for defendants:—Until the day of sale, neither Hubbard's agent or the sheriff had any information as to the order of sale. It is not against equity for a judgment *creditor to sell land first aliened by the debtor before resorting to land subsequently sold by him. The owner of the land first aliened must apply to Chancery before the sale, or he loses his right of having the lands bound by the judgment, sold in the inverse order of their alienation by the debtor. This principle is recognized in *Clowes* v. *Dick-*

[*232]

*inson*, (5 John. Ch. R. 235,) and in *Gill* v. *Lyon*, (1 John. Ch. R. 447.) If the complainant had filed his bill and obtained an injunction, the lien would have been preserved by statute. A judgment creditor warrants the title to the land sold under his judgment by the sheriff. (1 R. L. 504, sec. 11.)

THE CHANCELLOR :—The charge of fraud made against the defendant Hubbard, is fully met and disposed of by the answer and proofs. It is also denied in the answer, that Tuckerman had any lands in Willsborough or Denmark which were subject to the lien of the judgment, and no evidence is adduced to support that allegation in the bill. The situation of the Bridgewater lands is also fully explained in the answer. If there had been other lands in the counties of Oneida, Lewis or Essex, or even in the county of Madison, which were subject to the lien of this judgment, it could have made no difference in this case, as the lien of the judgment would have expired before those lands could have been advertised and sold. If the complainant wished to have those lands first applied, he should have offered to pay the amount of the judgment to Hubbard, and have taken an assignment of the same, if there was time to advertise and sell. But as there was not, it is probable, that by filing a bill against the several parties in interest before the expiration of the ten years, he might under the equity of the statute, (sess. 36, ch. 50, sec. 1, 1 R. L. 500,) have preserved the lien so far as to compel contribution according to equitable principles. At all events, if the remedy was gone as it respected himself, he had no right to require that Hubbard should lose the benefit of his lien on the lands which were advertised by the sheriff.

The only question then in this case is, what was equitable between the parties in relation to the lands actually *advertised by the sheriff of Madison? In *Clowes* v. *Dickinson*, (5 John. Ch. Rep. 235,) it was decided that a judgment creditor had no right to enforce his judgment against

[*233]

the land of a subsequent purchaser, so long as there was other land remaining in the hands of the judgment debtor or his heir at law, sufficient to satisfy the lien.[1]    In that case, also, a pretty strong opinion is intimated by the court, that as between successive purchasers there is to be no contribution, but their lands are chargeable with the incumbrance in the inverse order of alienation : that is, the lands of the last purchaser are to be first charged.    The eleventh section of the act concerning judgments and executions, (1 Rev. Laws, 503,) provides, that where lands or tenements, in the hands of several persons, shall be liable to satisfy any judgment or debt of record, and the whole, or more than a due proportion, shall be paid by or levied upon the lands of any one or more of them, the person aggrieved may have a writ out of Chancery, setting forth his or their grievance, directed to the justices of the Supreme Court, commanding them to hear the complaint, and to do justice to the parties, &c.    I am not aware that any proceedings have ever been had under this section of the statute, or that a construction has been given to it in any of our courts. But there appears to be nothing in its provisions inconsistent with the principle assumed by Chancellor Kent, and insisted on by the complainant in this case.    It frequently happens that judgments and mortgages are liens upon the lands of several persons where there is equality of equity, and where contribution would be just and proper; as in the case of several conveyances to different persons by the judgment debtor at the same time; or where the lands, bound by the judgment, are in the hands of the heirs at law of the debtor, or of different persons claiming under them.

Wherever the judgment creditor disposes of a part of the land held by the judgment, the purchaser has an equitable right to have the judgment discharged out of the residue of

[1] *Clowes* v. *Dickinson*, 9 Cow. 403; *Guion* v. *Knapp*, 6 Paige, 39; *Eddy* v. *Trarver*, 521; *Gill* v. *Lyon*, 1 John. Ch. 447.

the property. Although a subsequent purchaser has an equal equity to have the land which he has purchased and *paid for discharged from the lien of the judgment, as against the debtor, the first purchaser having the prior equity must be preferred. Where the equities are equal, and neither has the legal right, the maxim *qui prior est in tempore potior est in jure* prevails. (*Covell* v. *The Tradesman's Bank, ante*, 131.) It does not follow from what has been said, that the date of the conveyance is in all cases to determine the question as to the priority of equity between different purchasers. That is *prima facie* the time when the equitable right accrues. But if it should turn out that a purchaser had contracted for the purchase of his land and actually paid for the same, he would be preferred in equity to a subsequent purchaser, although the conveyance to the latter might be prior in point of time.

The equitable rights as between successive purchasers being established, the next question which arises is, what are their rights as against the judgment creditor ? In several cases the principle has been recognized, that where a creditor has a right to resort to two funds for the satisfaction of his debt, the party who has a subsequent claim upon one fund, only, may compel him to exhaust the other fund before he resorts to that in relation to which such subsequent claim exists.[1] (*Evertson* v. *Booth*, 19 John. 486; *The New York and New Jersey Steamboat Ferry Company* v. *The Association of the Jersey Company*, 1 Hopk. 460.) It is insisted by the defendant's counsel that this can only be done by a resort to the equitable power of this court in the first instance; and I am not aware of any case where it has been held that the creditor must, at his peril, decide upon

1828.

James
v.
Hubbard.

[1] *Halsey* v. *Reed*, 9 Paige, 446; *Ayres* v. *Husted*, 15 Conn. 504–519. The equitable doctrine in regard to the marshaling securities, is applicable only where one party has a lien or interest in two funds, with a right to resort to either or both, and another party has a lien on or an interest in only one of those funds. The *Farmers' Loan and Trust Co.* v. *Walworth*, 1 Comst. 433.

tne equitable rights existing among the holders of different portions of the property on which he has a general lien for the satisfaction of his debt.

If the agent of Hubbard had left the sheriff to exercise his own discretion in deciding upon the equitable claims of the different purchasers of the land, I should have no difficulty in this case in deciding that the purchase of the complainant's farm must stand, and that his remedy was against the other parties, to compel them to refund the purchase-money to *him, so far as they were benefited by such sale in discharging their own lands from the lien of the judgment. On the other hand, if the complainant had made all the owners of the lands, which he now insists should have been first sold, parties to this suit, I should have no difficulty in doing justice between them.

[*235]

No decree can be made affecting the rights of the owners of the half acre sold to Reynolds, or the three-tenths of ten acres sold to Curtis and McConnell. All the lands were sold which had been aliened subsequent to the Berry farm. It appears by the pleadings and proofs, that all the right and title which Tuckerman ever had to that farm ought to have been sold before either of the small pieces, or the lands of the complainant were charged. And as the heirs of Berry are parties to this suit, the complainant's equitable claim against that farm can still be enforced. I shall, therefore, direct that the same be sold under the direction of one of the masters of this court, and that the proceeds of such sale be applied in satisfaction of the amount for which the complainant's lands were sold; and if there is any thing remaining after satisfaction of that amount, that it be applied in payment of the complainant's costs in this suit. But as it also appears, by the pleadings and proofs, that the title to that farm is in dispute, it must be sold at the risk of the purchaser. The complainant must also be at liberty to redeem his land from the sale to Hubbard, on paying to him the amount of the purchase-money with interest thereon, at the rate of seven per cent. per annum; deduct-

ing the $13, which, by mistake, had not been credited on the judgment.

It is stated in the proofs, although I have not been able to find any allegation of the fact in the bill or admission in the answer that the reason why the Reynolds' lot was not sold was, that there had been some agreement with Hubbard, by which that lot was discharged from the lien of the judgment. If such was the case, the complainant had a right to have the value of the lot deducted from the amount due on the judgment before his lot was sold. If, therefore, the Berry lot shall prove insufficient to satisfy the amount charged on the complainant's farm, with costs, as above mentioned, it must *be referred to a master to examine and report whether Hubbard had done any act by which the lien of his judgment on the Reynold's lot had been legally or equitably discharged, previous to the sheriff's sale; and if it had been so discharged, the master is further to report the value of that lot at the time of the sheriff's sale, allowing the. owner to retain the possession thereof until the expiration of the time of redemption on sheriff's sales; and that on the coming in and confirmation of such report, the value so reported, with the interest thereof, or so much as may be necessary to satisfy the balance due to the complainants as aforesaid, be paid to him by the defendant Hubbard, or allowed towards the redemption of the complainant's land from the sheriff's sale.