# NICHOLAS P. IGLEHART *et al.*
## *v.*
# CRANE & WESSON.

1.  MORTGAGES — *subsequent purchaser from the mortgagor of a part of the premises — only secondarily liable.* If a mortgagor conveys a portion of the mortgaged premises, retaining a portion himself, as between the mortgagor and his grantee, that portion retained by the mortgagor should be first applied to the payment of the mortgage.

2.  And when a court of chancery requires a mortgagee first to exhaust that part of the mortgaged property still held by the mortgagor, it is only another application of the principle, that where there are two creditors standing in equal equity, one of whom has security upon two funds and the other upon only one of the two, the former is required to proceed, primarily, against the fund upon which the latter has no claim.

3.  SAME — *subsequent purchaser of the remaining portion — of his rights in respect to the prior purchaser.* A subsequent purchaser of the portion thus retained by the mortgagor, with notice of the prior sale of the other portion, simply steps into the shoes of the mortgagor, and will hold his portion subject to be charged primarily with the payment of the mortgage. He can claim no equity which would displace that of the prior grantee of the other portion of the mortgaged premises, who may still insist that the portion remaining when he purchased shall be first exhausted, in satisfaction of the mortgage, before his portion shall be chargeable therewith.

4.  SAME — *of successive sales by the mortgagor to different persons — of the relative rights of the several purchasers.* So, when a mortgagor makes successive sales of distinct parcels of the mortgaged property to different persons having notice of the prior sales, and the mortgagee afterward files a bill to foreclose, the different parcels are to be subjected to the payment of the mortgage in the inverse order of their alienation.

5.  SAME — *release by the mortgagee of the primary fund — its effect upon the portion secondarily liable.* From the foregoing rule as to the order in which mortgaged premises shall be charged, it follows, that if the mortgagee, with actual notice of the facts, releases from the mortgage that portion of the premises primarily liable, he thereby releases, *pro tanto,* the portion secondarily liable. When the mortgage is sought to be enforced against the owner of the latter he can claim an abatement of his liability to the extent of the value of that portion which should have made the primary fund.

6.  SAME — *of the character of notice which must be given to a prior incumbrancer, of subsequent conveyances.* A mortgagee is not required to take notice of the registry of deeds made subsequent to his own mortgage. In order to charge him with notice of such subsequent conveyances, so as to affect his

action in respect to the rights of those holding under them, the notice must be actual, not constructive.

7. SAME — *subsequent purchasers affected by constructive notice.* But, while the mortgagee must have actual notice in order to affect his rights, a second or subsequent purchaser from the mortgagor is bound by the constructive notice furnished by the registry of prior conveyances of any portion of the mortgaged premises.

8. CROSS-BILL — *whether necessary.* Upon bill filed to foreclose a mortgage, against several successive subsequent purchasers, who desired to set up against the complainant a release which he had given in respect to a part of the mortgaged premises which were primarily liable for the satisfaction of the mortgage, as a ground for holding the mortgage, to a certain extent, discharged, it is not necessary to file a cross-bill for that purpose, but the relief sought by the defendant, in that regard, may be obtained under the proper allegations in his answer.

9. SUBSEQUENT PURCHASERS *from mortgagor — not affected by an agreement between mortgagor and mortgagee, of which they have no notice.* Where a mortgagee executed an agreement to his mortgagor that he would release from time to time such portion of the mortgaged premises as the mortgagor might sell, upon being paid on the purchase money a certain sum on each parcel sold, subsequent purchasers from the mortgagor who had not obtained releases, would not be affected by such agreement, unless they had notice of it, either actual or constructive.

APPEAL from the Superior Court of Chicago.

The opinion of the court contains a statement of the case.

Messrs. GARRISON & BLANCHARD, for the appellants, Garrison and Hartshorn.

Mr. GEORGE F. BAILEY, for the appellees.

Mr. JUSTICE LAWRENCE delivered the opinion of the Court:

On the 8th of January, 1853, the appellees, Crane & Wesson, resident in Detroit, sold and conveyed to Nicholas P. Iglehart, of Chicago, blocks 27 and 28 in the south-east quarter of section 17, township 39, range 4, in said city. Iglehart paid $500 in hand and, for the balance, $24,500, executed to the vendors his bond, secured by a mortgage upon the premises. The deed and mortgage were duly recorded. The bond called for payment in certain sums quarterly, the last payment maturing June 1,

1861, and also for the payment every three months of all moneys received by Iglehart upon the sale of lots, to be applied as a credit upon the installment next falling due upon said land. At the same time Crane & Wesson executed an instrument by which they agreed to discharge from the mortgage " any lots fronting upon Hoosier avenue on payment of $200 each, not less than five lots at a time, and any lots on Hoosier avenue at $350 each, not less than three at a time." This agreement was not recorded until February 14, 1859.

On the 29th of November, 1853, Iglehart subdivided the blocks into 151 lots and commenced their sale. In May, 1857, Crane & Wesson, having received the amount then due upon the land, released thirty-two lots from the mortgage. Other lots were released from time to time until October, 1859, when the last releases were executed. Fifty-seven of the lots sold were thus released. At the October Term, 1861, of the Superior Court of Chicago, Crane & Wesson, to whom a large balance was due upon the bond, filed their bill to foreclose the mortgage upon the unreleased lots, making the several purchasers parties. The cause came on to a hearing upon bill, answers, replications and proofs, and the court pronounced a decree for the unpaid purchase money and distributed the payment among all the unreleased lots. The master, to whom the case had been referred, reported that the amount already received on the released lots was sufficient to cover their equitable portion of the mortgage debt, on the principle of equality of burden among all the lots, and the decree was framed upon this principle. The defendants who were interested in lots 83, 84, 89, 116, 117, 118, 149 and 150, appealed from the decree so far as it related to those lots, and have brought the record to this court.

These lots were sold and conveyed by Iglehart, in 1855, long prior to the execution of the releases by Crane & Wesson, and long prior to the registry of the agreement above referred to, given by them to Iglehart, of which agreement it does not appear the purchasers of these lots had notice. A part of the lots released were not sold until after the sale of the lots as to

which the appeal was taken. Whether they were all sold after these lots, or how many of them, is not necessary to be determined for the purposes of this opinion.

It is contended by the appellants, that, when a mortgagor makes successive sales of distinct parcels of the mortgaged property, to different persons having notice of the prior sales, and the mortgagee afterward files a bill to foreclose, the different parcels are to be subjected to the payment of the mortgage in the inverse order of their alienation. It is further contended, as a consequence of the foregoing principle, that, if the mortgagee, with actual knowledge of all the facts, releases a part of the property thus conveyed, he thereby discharges his lien *pro tanto*, and, to the extent of the value of the part released, upon those parcels held under prior conveyances from the mortgagor. It is further urged, that the court below erred in subjecting the lots of the appellants to the payment of the mortgage upon the principle of equality of burden among all the lots, and in disregard of the foregoing rules. On the other hand, it is insisted by the appellees that this rule, as to the inverse order of alienation, is not so firmly established in chancery practice as to be obligatory upon the court by force of precedent, and that upon its own merits it ought not to be adopted. It is further urged, that, if it be recognized as the rule, it ought not to be applied to the case at bar.

The counsel for the appellees has presented his views with much force, but we cannot concur in them.

This question was incidentally before the court in the case of *McLaurie* v. *Thomas*, January Term, 1866, (reported in 39 Ill. 291) but was not definitely decided. We have now given it a full examination, and, although the courts in Kentucky and Iowa have declined to adopt the principle contended for by appellants, yet we find the large current of authorities, both in Great Britain and in this country, so decidedly in its favor, and the rule itself rests upon such grounds of equity and reason, that we cannot refuse to accept it as the law. It rests, indeed, upon a simple principle. If a mortgagor conveys a portion of the mortgaged premises, retaining a portion himself, it is

familiar law and admitted by all the cases, that, as between the mortgagor and his grantee, that portion retained by the mortgagor should be first applied to the payment of the mortgage. An equitable lien attaches for this purpose in favor of the grantee, as against the parcel held by the mortgagor. The equity of this rule is apparent, on the plain ground that a man's own property should be first applied to the payment of his own debts, and when a court of chancery requires a morgagee first to exhaust that part of the mortgaged property still held by the mortgagor, it is only another application of the principle so long and so firmly settled by courts of equity, that, where there are two creditors standing in equal equity, one of whom has security upon two funds and the other upon only one of the two, the former is required to proceed primarily against the fund upon which the latter has no claim.

The justice of first subjecting to the payment of the mortgage so much of the mortgaged property as may still remain in the hands of the mortgagor, cannot be denied, and is admitted by the counsel for the appellees. If, then, this species of equitable lien has attached in favor of a purchaser of a part of the mortgaged premises against the residue in the hands of the mortgagor, how is this residue to be considered as discharged from the lien, merely by a sale and conveyance of it to a third person taking with notice of all the facts? The purchaser with notice simply steps into the shoes of the mortgagor. He can claim no equity which would displace that of the prior grantee of the other portion of the mortgaged premises, because, having voluntarily and knowingly become the purchaser, he cannot, by such act, and at his own mere. volition, displace or impair the equity of another.

This is the ground upon which rests the rule that mortgaged premises are to be subjected to the lien in the inverse order of their alienation, where the subsequent purchasers have bought with notice, and, as already remarked, in our opinion, the rule has a most persuasive equity.

We will refer to some of the cases in which this question has been considered.

In *Hartley* v. *O'Flaherty,* Lloyd & Gould, Cases Temp. Plunket, 216, Lord PLUNKET says: " If a mortgagor sells a portion of his equity of redemption for valuable or good consideration, the entire residue undisposed of by him is applicable, in the first instance, to the discharge of the mortgage and in ease of the *bona fide* purchaser; and it is contrary to any principle of justice to say that a person afterward purchasing from that mortgagor shall be in a better situation than the mortgagor himself in respect to any of his rights."

In *Hamilton* v. *Royce,* 2 Schoales & Lefroy, 326, Lord REDESDALE, said : " The rule is very clear. A purchaser takes subject to all equities to which the vendor was subject, and of which the purchaser had notice. Here the purchaser takes under the settlement of January, 1788; without that settlement he has no title; consequently he takes with notice of that settlement and with notice of a clear equity against the estate which he has purchased, that is, that whatever incumbrances might affect the estate of *Boherlack,* were to be made good out of this estate." The learned judge then states an unreported case decided by Lord HARDWICKE to the same purport.

In *Averill* v. *Wade,* Lloyd & Gould, Temp. SUGDEN, the chancellor, says : " A man seized of estates A & B, both subject to a judgment debt, settles A for a valuable consideration, without noticing the judgment ; the judgment creditor would be compelled to go against estate B, and the persons claiming under the settlement would be entitled to have the settled estate exonerated at the expense of the unsettled estate ; the judgment binds both, and where there is a settlement of part of an estate, as if free from incumbrance, equity will throw the whole on the unsettled part which still belongs to the original owner."

This question, however, seems to have been less fully considered in the English than in the American courts. Here it has often been directly presented for adjudication, and, as already stated, the preponderance of authority is largely in favor of the rule growing out of the inverse order of alienation. In *Clowes* v. *Dickinson,* 5 Johns. Ch. 240, the great authority of

Chancellor KENT is recorded in an elaborate opinion in favor of the rule. He refers to Harbert's case, 3 Coke, 11, where it was resolved, that, if A be seized of three acres, and acknowledge a recognizance or statute, and enfeoff A of one acre, and B of another, and the third acre descends to the heir, and execution be sued out against the heir, he shall not have contribution against the purchasers, "for the heir sits in the seat of his ancestor," and the chancellor adds, in reference to successive, purchasers of different portions of incumbered property, that they too may be said to sit in the seat of their grantors. This rule has since been followed by the New York courts in many cases. *James* v. *Hubbard*, 1 Paige, 234; *Jenkins* v. *Freyer*, 4 id. 53; *Guion* v. *Knapp*, 6 id. 35; *Patty* v. *Pease*, 8 id. 277; *Skeel* v. *Spraker*, id. 182. The rule has been settled in the same way in Vermont, in *Lyman* v. *Lyman*, 32 Vt. 79; in New Jersey, in *Shannon* v. *Marsells*, 1 Saxton, 413, and in *Wickoff* v. *Davis*, 3 Green Ch. 224; in Virginia, in *Hinkle* v. *Alslatt*, 4 Gratt. 284, and *Jones* v. *Myrick*, 8 id. 179, and in New Hampshire, in *Brown* v. *Simons*, 44 N. H. 475. The Supreme Court of Massachusetts recognizes the rule in *Allen* v. *Clark*, 17 Pick. 47, and in *Chase* v. *Woodbury*, 6 Cush. 143, though a different principle seems to have been applied in *Parkman* v. *Welch*, 19 Pick. 241. In Ohio, also, there is some conflict of authority, the rule having been adopted in the *Com. Bank of Lake Erie* v. *W. B. Bank*, 11 Ohio, 444, and disregarded in *Green* v. *Ramage*, 18 id. 428, without, however, professing to overrule the first case. In Maine, the rule is recognized in *Holden* v. *Pike*, 24 Maine, 427, and *Shepherd* v. *Adams*, 32 id. 63, though the facts in these cases did not call for its application.

The only States in which this doctrine is distinctly repudiated, so far as we are aware, and the principle of equality of contribution among all the purchasers of the mortgaged premises applied, are Kentucky, in *Dickey* v. *Thompson*, 8 B. Mon. 312, and Iowa, in *Bates* v. *Ruddick*, 2 Clarke, 423. We do not deem the reasoning in those cases satisfactory, and their au-

thority must yield to that of the many courts that have laid down a different rule.

From this rule, as to the order in which mortgaged premises are to be charged, it follows as a corollary, that, if the mortgagee, with actual notice of the facts, releases from the mortgage that portion of the premises primarily liable, he thereby releases *pro tanto*, the portion secondarily liable. When the mortgage is sought to be enforced against the owner of the latter, he can claim an abatement of his liability to the extent of the value of that portion which should have made the primary fund. But the notice to the mortgagee must be actual and not constructive. It would be unreasonable to require a mortgagee to take notice of the registry of deeds made subsequent to his own mortgage. He is neither a " creditor " nor a " subsequent purchaser," and therefore falls neither within the letter nor spirit of the recording laws. See *Mattison* v. *Thomas*, decided at the present term of the court (reported in 41 Ill. 110) and cases there cited. See also Washburne on Real Property, 572 ; *Patty* v. *Pease*, 8 Paige, 277 ; *Taylor, Exr.,* v. *Morris*, 5 Rawle, 51 ; *Cheesebrough* v. *Willard*, 1 Johns. Ch. 409 ; *Stuyvesant* v. *Hone*, 1 Sand. Ch. 419 ; *James* v. *Brown*, 11 Mich. 26 ; *George* v. *Wood*, 9 Allen, 80 ; *Stuyvesant* v. *Hall*, 2 Barb. Ch. 151. It is easy for the first purchaser from the mortgagor to give notice to the mortgagee, but to require of the latter an examination of the registry for subsequent conveyances which cannot impair his lien, and in which he has no direct interest, would be imposing upon him a burden that does not belong to his position. All the authorities agree, that this doctrine of inverse order is to be so applied by the courts as not to impair the security of the mortgagee. But, when the mortgagee, having actual notice, releases the part primarily liable, the act draws after it the consequences above stated. This has been often decided. *Skeel* v. *Spraker*, 8 Paige, 195 ; *Patty* v. *Pease*, id. 277 ; *Brown* v. *Simons*, 44 N. H. 475 ; *Stuyvesant* v. *Hall*, 2 Barb. Ch. 151 ; *Lyman* v. *Lyman*, 32 Vt. 79 ; *Chase* v. *Woodbury*, 6 Cush. 143 ; *Carter* v. *Neal*, 24 Georgia, 346 ; *Shannon* v. *Marselis*, 1 Saxton (N. J.) 413.

But, while the mortgagee must have actual notice in order to affect his rights, a second or subsequent purchaser from the mortgagor is bound by the constructive notice furnished by the registry of prior conveyances of any portion of the mortgaged premises.

When the first grantee from the mortgagor has duly recorded his conveyance he has done all in his power. Not knowing who may be future purchasers of other portions of the premises, he cannot give them actual notice. The Supreme Court of New Hampshire in *Brown* v. *Simons*, 44 N. H. 475, speaking of the subsequent purchaser, say: " in the examination of the title to the part he proposes to buy, he is led directly to the original mortgage, and he finds that his is but part of an entire tract in which his grantor has only a right of redemption, and which was originally subject to a common burden, but liable to be affected by a prior sale of another part of the entire tract. Under such circumstances the different parcels of the tract mortgaged cannot be considered as separate and distinct, so as to relieve him of the duty of inquiring into the title to the other part; but, we think, that, in examining the title to the part he proposes to buy, he is led directly to a deed that puts him on inquiry as to the remaining part of the land." In support of these views the court refer to 2 Fonbl. Eq. b. 3, ch. 3, section 1, note ; 4 Greenl. (Cruise) 452, note ; *Parkert* v. *Alexander*, 1 Johns. Ch. 398 ; *Chase* v. *Woodbury*, 6 Cush. 113 ; *La Farge Fire Ins. Co.* v. *Bell*, 22 Barb. 54 ; *Montgomery* v. *Dorion*, 6 N. H. 255 ; *French* v. *Gray*, 2 Conn. 108.

We concur in the views expressed by the Supreme Court of New Hampshire.

It remains to be considered whether the case at bar falls within the principles above stated.

It is urged by the counsel for the appellees, that they had no actual notice of the prior conveyances when they executed the releases. There is, it is true, no direct and positive proof, but the inference of notice, from the correspondence introduced in evidence, and from other circumstances proven, is irresistible. The land was sold in June, 1853, and the arrangement between

the parties at that time was, that it was to be subdivided into not less than one hundred and fifty lots for the purpose of sale to various purchasers. Iglehart was to pay twenty-five thousand dollars. He paid only five hundred in hand, giving bond and mortgage for twenty-four thousand five hundred. It is evident, from the character of this contract, that the vendors relied for payment on the proceeds of the sale of the lots, and accordingly they inserted in the bond a provision, not only for the payment of the balance in stipulated sums quarterly, but also that Iglehart was to pay over quarterly all the moneys he had received on sales of lots. The peculiar character of this contract thus furnished the strongest inducement to the vendors to keep themselves fully informed of the sales made by Iglehart. The first release was executed May 18, 1857, and, prior to that time, a large number, we believe more than half, of the lots had been sold. We find, in the correspondence prior to that date, numerous letters from Crane & Wesson to Iglehart (those from Iglehart to Crane & Wesson, it should be observed, are not in the record) pressing for payment, stating their need of money, and giving reasons why they should not send releases asked for by Iglehart. There is a large mass of this correspondence, and it shows, on the part of Crane & Wesson, who were themselves professional dealers in real estate, a perfect knowledge of their business with Iglehart. But these letters furnish only a part of the proof. It appears by the testimony of several witnesses, who were clerks in the office of Iglehart, that one of the firm of Crane & Wesson was in Chicago two or three times every year, and that, when at the office of Iglehart, he would examine the books relating to this transaction, one of which was a volume having these lots numerically arranged, and showing what sales had been made and the condition of each lot.

Now it is not conceivable that an intelligent business man, himself a real estate dealer, and having a contract of this peculiar kind with another real estate dealer, by the terms of which both his security, and the amount due, would depend largely on the disposition that had been made of the different lots; needing money, pressing for payment, and not very well satis-

fied with the doings of his vendee, and actually examining from time to time a book containing a plain statement of the sales, or at least taking the books and going with his vendee into an inner room, as appears by the testimony,— it is not conceivable, we say, that he should not have ascertained how the business was progressing, and what lots were sold. Moreover, the first release was for thirty-two lots which were sold in a body when the release was executed, and Crane came on from Detroit, and participated personally in the transaction. The lots in controversy had then been sold for more than two years, and a large number of all the lots had been sold at that time. The complainants knew this fact, and, although Crane, when he delivered this release in Chicago, may not have been able to give from memory the number of each lot sold, and the name of the purchaser, yet these facts must have been brought to his knowledge before this time, and he knew that all the details of the business were at hand in the books of Iglehart, which he often examined. We are obliged to consider the complainants as chargeable with notice.

It is also urged by counsel for appellees, that the appellants should have filed a cross-bill. If the complainants had executed no releases, and the appellants had sought merely to procure a decree directing the lots last conveyed to be first sold, it would doubtless have been necessary to file a cross-bill, making their co-defendants parties, as they would have been asking a decree to the prejudice of their co-defendants. But, for the mere purpose of setting up against the complainants a release executed by them, as a ground for holding the mortgage, to a certain extent, discharged, we see no reason for filing a cross-bill.

It is further urged, that the special agreement to release each lot whenever a certain amount should be paid upon it, must be considered as withdrawing this case from the ordinary rule. But that agreement was not recorded until February 14, 1859, and there is no pretense that it was known to the purchasers of the lots in controversy. Their equity, therefore, attached as if no such agreement were in existence.

The decree, so far as it relates to these appellants, is reversed, and the cause is remanded for further proceedings in conformity with this opinion. Before a decree can be pronounced against the lots of appellants, the value of the lots released, at the time of such release, over and above the amount paid on them, must be ascertained and allowed as a credit on the mortgage.

*Decree reversed.*