## JOHN M. McCLELLAND
### v.
## ICHABOD S. BARTLETT ET AL.

1. PROMISSORY NOTE—PAYMENT.—It is the duty of a party paying negotiable paper, before parting with his money, to demand the production of the notes. Where a party fails to do this and loss occurs thereby, the law holds him guilty of such negligence as would throw the occurring loss upon him, according to the principle that "where one of two persons must suffer loss, he, who by his negligent conduct made it possible for the loss to occur, must bear it."

2. RELEASE.—The same duty would devolve on a party who was undertaking to pay the notes, to see to it that they were actually paid before accepting a release, the validity of which he knew depended upon the payment of the notes, and this rule would apply to all parties having such knowledge.

APPEAL from the Circuit Court of Kane county; the Hon. C. W. UPTON, Judge, presiding. Opinion filed July 27, 1883.

Mr. R. N. BOTSFORD, for appellant; that where the proof shows an agent's acts to be general, the law will infer a general power to act in relation to the subject-matter of the agency, cited Hurd v. Marple, 2 Bradwell, 402; Hodgen v. Kief, 63 Ill. 146; 2 Kent's Commentaries, 620; Doan v. Duncan, 17 Ill. 274; N. S. Life Ins. Co. v. The Advance Co. 80 Ill. 549; Mason v. Bauman, 62 Ill. 76; McGregor v. McDevitt, 64 Ill. 261.

When the maker of a note pays to one not the holder without requiring the production of the note, he pays at his peril: Holmes v. Fields, 12 Ill. 429; Myers v. Moore, 28 Ill. 428; Coffman v. Bank of Ky. 41 Miss. 217; Elgin v. Hill, 27 Cal. 373; Story on Promissory Notes, §§ 375, 382.

Where a mortgage is on the public records, all parties deal-

ing with the property are bound to take notice: Morrison v. Brown, 83 Ill. 562; Brown v. Welch, 18 Ill. 347.

Where a mortgage secures negotiable notes and the notes are assigned before maturity, to a *bona fide* indorsee, payment by the maker to a person not the holder is not a good payment: Ogle v. Turpin, 102 Ill. 148; Keohane v. Smith, 97 Ill. 156.

The former opinion of this court is *res adjudicata:* Ogle v. Turpin, 8 Bradwell, 454.

Mr. J. W. RANSTEAD, for appellees; that authority to receive payment of notes, does not give power to assign them, cited Ryhiner v. Feickert, 92 Ill. 311; Thompson v. Elliott, 73 Ill. 221; Taylor v. Atchison, 54 Ill. 200; Padfield v. Green, 85 Ill. 529; Ames v. Drew, 31 N. H. 475; Story on Agency, §§ 96, 98, 126.

Whatever puts a party on inquiry, amounts, in judgment of law, to notice, provided such inquiry becomes a duty: C. R. I. & P. R. R. Co. v. Kennedy, 70 Ill. 350; Harper v. Ely, 56 Ill. 179; Henneberry v. Morse, 56 Ill. 394; Babcock v. Lisk, 57 Ill. 327; Flint v. Lewis, 61 Ill. 299.

Any defense which could be availing to appellee Bartlett as against the payee or previous holder of these notes would be equally so as against the complainant, as assignee: Olds v. Cummings, 31 Ill. 189; Haskell v. Brown, 65 Ill. 29; Bryant v. Vix, 83 Ill. 12; Melendy v. Keen, 89 Ill. 404; White v. Sutherland, 64 Ill. 186: Walker v. Dement, 42 Ill. 277; Fortier v. Darst, 31 Ill. 215; Sumner v. Waugh, 56 Ill. 531: Keohane v. Smith, 97 Ill. 156; Silverman v. Bullock, 98 Ill. 11; Ogle v. Turpin, 102 Ill. 148.

A fraudulent vendor may convey a better title than he has, and his grantee will be affected by the fraud of the grantor, only where by the exercise of ordinary prudence and caution, he could have ascertained the fact of such fraud: Morrison v. Kelly, 22 Ill. 625; Hunter v. Stoneburner, 92 Ill. 75; Prevo v. Walters, 4 Scam. 35.

LACEY, P. J.   On October 21, 1870, appellee Bartlett purchased the ten acres of real estate in question from E. S. Wilcox

and wife taking a warranty deed and giving back a mortgage to secure the unpaid purchase money, one thousand dollars having been paid in cash. There were two $500 notes due in one and two years, and two $800 notes due in two and three years from date, bearing the same date with the deed, all drawing ten per cent. interest. The deed was filed for record October 26, and the mortgage November 15, 1870. The appellant became as he claims, the *bona fide* purchaser of the two last unpaid notes from J. S. Wilcox the indorser of the notes from E. S. Wilcox and has filed this bill in equity to foreclose the mortgage on a portion of the real estate described in the mortgage. After the purchase Bartlett divided the land into 40 town lots, a part of the city of Elgin. After subdivision and before 1873, Bartlett sold lots one, two, three, four, five, six and seven, and in the spring of 1873 entered into a contract with one James Coleman, a lawyer, selling him an interest in the lots unsold, and gave him a written agreement of sale which is lost. As Coleman testifies he agreed to pay for Bartlett the two $800 notes in question in this suit with interest, and to pay him directly $700 on or before October 25, 1873. The title still remained and was to remain in Bartlett, and he was to pay the notes from the proceeds of the sale of the lots. By an arrangement there was to be a public sale of the lots by Coleman, and after the sale Bartlett was to make out the deeds and leave them with one Kribs, a lawyer, to deliver to the purchasers upon their complying with the terms of the sale, one third cash in hand and the balance on time; the notes and mortgages for balance were to run to Bartlett, and Kribs was to pay off the two $800 notes and the $700 to Bartlett and balance of the unsold lots to be Coleman's. Coleman and John S. Wilcox not being on good terms, the former suggested Kribs to do the business and Bartlett consented. The latter then saw Wilcox and told him the arrangement, and that Kribs would pay the notes from the sales and Wilcox consented to this arrangement.

J. S. Wilcox had purchased the mortgage and notes about two years prior to that time, and E. S. Wilcox had indorsed the notes to him in blank and assigned the mortgage to him,

and gave him at the same time a blank release of the mortgage, to enable J. S. Wilcox to satisfy the mortgage when it should be paid off.

We are inclined to think that the release was blank in respect to the description of the land, that having been left blank in order that the land might be described in whole or in part, as occasion required by the party holding the mortgage, enabling him to release a portion or all the mortgaged premises.    This, however, is disputed by counsel for appellee, who claim that the release was one in full and completely filled up, and left with Kribs by J. S. Wilcox, to be put on record or delivered to interested parties when and as soon as the two $800 notes in question were fully paid, and that this release was held by Kribs after he had received a sufficient amount of money from the proceeds of the sale of lots and notes taken for the deferred payments of the purchase money of the lots.    But after a careful perusal of all the evidence we are inclined to think that if J. S. Wilcox ever delivered any release to Kribs it was a blank one.    He testifies that he does not remember that he had a release but he thinks he had; that his recollection is not distinct; that he left the notes and mortgage with Kribs, but was not sure about the release and assignment; that he had no distinct recollection about them.    E. S. Wilcox testifies positively about the matter and states that he made the assignment of the notes to his brother, and made a blank release; that he made another release at the request of Kribs who enclosed to him a blank claiming the original had been lost or mislaid, and made still another release under the same circumstances. There are two releases executed by E. S. Wilcox in evidence. One dated October 10, 1873, releasing lots 15, 21, 22, 23, 31, 32, 33, 36, 37, 17 and 19, and filed for record November 10, 1873, also another one, executed by the same party releasing lots 10, 12, 14 and 16, recorded February 2, 1874; this last one was made at the special demand of James Lynd who received a deed from Kribs for those lots dated January 8, 1874, and recorded July 2, 1874.    The circumstances of the execution of this last named release is told by W. H. Wing, an at-

torney, who examined the title for Lynd, who says he made
the negotiation with Bartlett and Kribs was there. "They had
a release from E. S. Wilcox in Kribs' office, a long form and
some lots filled in it. They proposed to have the Lynd lots
put in that release of this mortgage and I objected." The
witness identified the release first above described as the one
he saw. The witness then had a separate release got from E.
S. Wilcox which is the one last above described. It is true
that Bartlett testifies that he saw a release for the whole ten
acres of land in Kribs' office between the 10th and 15th of.
October, 1873, and asked Kribs to have it recorded. Cole-
man also testifies that he also saw a release for all the land
by E. S. Wilcox in Kribs' possession with the two notes and
mortgage; that he never saw a partial release of the property
before the commencement of this suit. Yet Bartlett testified
as reported in the certificate of evidence filed herein and used
on the former trial of this case and in evidence here as fol-
lows: " Kribs said he had a release of the mortgage from
Wilcox (release shown witness). I think that it is the release
he had. I understood it to be a release of all the property;
asked him to have it recorded. I don't remember that there
was any particular description in the release; it was a short
one; it was signed by E. S. Wilcox, think it was a short form;
saw it between the 10th and 15th of October, 1873," Coleman
also testified in his former examination in regard to the re-
lease: "I saw release of mortgage in Kribs' hand about Oc-
tober 10, 1873. The abstract showed the Wilcox mortgage
but the release was with Kribs."

On cross-examination he testified: " There was a release in
Kribs' possession; will not swear it was not one of the releases
in evidence; it was not the understanding that a release should
be prepared in blank to put lots in as they were sold. I will
not swear that there was not such an arrangement." On re-
examination he said: "Kribs had one release; may have had
two." Weeghtman said, " think Coleman showed him a re-
lease of the lots in connection with other property adjoining,
I had nothing to do with Kribs."

This was all the evidence on the subject of the release and

McClelland v. Bartlett.

it seems to us that it can not be considered that it has been formally established that any release other than the ones in evidence was ever in the hands of Kribs. Kribs had been sent to the penitentiary for his crime in this transaction, and although he has been released from imprisonment his evidence has not been taken. Comparing the evidence of Bartlett and Coleman on the subject of the release taken on the two different occasions, we find it so radically contradictory and irreconcilable, that we are not able to give it any considerable weight as establishing the fact that there was ever a complete release placed in the hands of Kribs by J. S. Wilcox. If one ever was left in his hands it must have been a blank never filled out. Wing was negotiating with Bartlett in Kribs' office and they had the release in evidence dated October 10, 1873, present, and this must have been the only release that Bartlett ever saw, because he speaks of seeing but one, and in his first evidence taken he does not positively state that he knew the contents, and it must have been the only one Coleman saw except perhaps the Lynd release, for he will not say in his evidence first taken that the release he refers to was not the one in evidence.

But if there had been a release in full left with Kribs by J. S. Wilcox, it was not intended as a present release of the property but only to become so when the mortgage notes were fully paid and not till then. J. S. Wilcox, as requested by Bartlett, left the two notes with Kribs, and at the time he deposited them with him he wrote over the blank indorsement of his brother E. S. Wilcox, the words " without recourse " at Kribs' request or suggestion, so that they might be negotiated and passed to any purchaser in case of a possible negotiation, which must have been contemplated, no restriction being placed on their negotiability, and when Wilcox was paid he made no inquiry as to what had been done with the notes, and did not in fact know. Wilcox did not regard Kribs as his agent but the agent of Bartlett.

Kribs being in possession of these notes and papers in the manner described, and invested with the apparent ownership, on the 9th day of October, 1873, sold and delivered them to

the appellant for the sum of $1,600, the latter paying him for them .in two checks on the First National Bank, one for $1,000, dated October 9, 1873, and one for $600, dated October 23d of the same year, telling appellant at the time of sale that the notes were secured by mortgage on land near the Fair Ground.

He did not deliver the mortgage to appellant at the time but told him that Lewis had it and that Bartlett lived in Chicago and did not want to pay the notes just then, and afterward told him the mortgage was burned up in Kribs' office. Appellant had implicit confidence in Kribs and bought the notes in good faith without any knowledge of any arrangement between Coleman, Bartlett, J. S. Wilcox and Kribs; he made no inquiries of J. S. Wilcox concerning the matter; his name not appearing on the papers he did not know that he had any connection with the notes, and E. S. Wilcox lived in DeKalb county. The one thousand dollar check was exchanged at the bank by Kribs for a certificate of deposit, and that was paid to J. S. Wilcox as payment on the notes by Kribs. How the balance was paid, whether out of the money of appellant or from the proceeds of sale, it is not known, except $150 paid by Lynch for one of the lots was supposed to be paid to J. S. Wilcox by Kribs. Appellant kept the notes till some time in 1875 without any knowledge that Bartlett claimed to have paid them, Kribs having kept the interest paid, when upon asking Bartlett for payment he so claimed. The advertised sale took place on the 27th day of September, 1873, and various parties bid in lots at the sale and complied with the terms, on and after the 10th day of October of same year, for it was not until the latter date that Bartlett and wife executed the deeds to the purchasers, and left them with Kribs for delivery upon their complying with the terms of the sale.

The amount of the sales is variously estimated by Bartlett and Coleman from $6,000 to $3,765. On the evening of the 10th of October, 1873, Bartlett, Coleman and Kribs met at the latter's office to make settlement of the matter, the two former, as they claim, being ignorant of the sale of the notes in question to complainant. Accordingly Bartlett settled with

McClelland v. Bartlett.

Coleman, the latter agreeing to pay the two notes supposed to be in Kribs' hands belonging to Wilcox, but in reality then being in the hands of complainant, and paying or allowing Kribs $50 for his services, and allowing Bartlett $700 or $800 coming to him from Coleman, the balance was given to Coleman. At that time Bartlett and Coleman both being financially embarrassed and not daring, for fear of their creditors, to hold the residue of the lots not sold in either of their names, Bartlett deeded all the residue of the lots to Kribs, supposed to be at that time reliable and honest, who was to hold the title and convey at the request of Coleman or Coleman and Bartlett, it being difficult to understand the relation they bore to each other in respect to the ownership of the property.

Bartlett also left all his notes in the hands of Kribs to collect and pay out for him on certain debts of the former, and Kribs had been paying the interest on the Wilcox notes for Bartlett for two or three years prior to the sale. Bartlett since that time has never had any settlement with Kribs, and does not know how their accounts stand, whether Kribs would be indebted to Bartlett or the reverse.

This cause was heard in this court on appeal by appellant from a similar decree of the court below dismissing the complainant's bill and denying his right to foreclose his mortgage, and sell any of the lots described in the bill, and the decree was reversed and the cause remanded, deciding that the appellant was entitled to the relief sought. See 3 Bradwell, 481. The case has been retried and some new evidence taken, but we do not think the material features of the case have been changed, and the court has again rendered a decree dismissing the appellant's bill and denying him any relief, except to save his right to sue Bartlett at law on the notes. The appellant again appeals to this court and asks a reversal of the decree. We have examined the evidence carefully and fully considered the arguments of counsel for and against the relief sought, and are of the opinion that the appellant is entitled to a foreclosure as against a portion of the lots, namely, those that have not been released by the releases recorded and executed by E. S. Wilcox.

We will examine the case first, with a view of determining the condition and rights of the parties primarily interested in the transaction, i. e., appellant, Bartlett, Coleman, Kribs and J. S. Wilcox. In the first place, Kribs was the agent of Bartlett and Coleman to obtain and get into his hands the notes purchased by appellant, so that, in some manner, he could have the control of them that they might be paid, and Kribs was requested and authorized by them to get them into his possession, and J. S. Wilcox was solicited to put them there, which he did. Kribs was his agent, if at all, to hold the notes and pay the money over to him when he received it. At Kribs' request, the notes were filled in a condition to be negotiated, and that appeared to be one of the ways contemplated by him and J. S. Wilcox, by which the money was to be raised. Wilcox was, as may be readily seen, indifferent as to the manner of raising the money so long as he was not liable as an indorser, and therefore consented to indorse the notes, and did so, restricting his liability. Neither in the indorsement nor in the manner of making it, had Wilcox any intention of deceiving either or defrauding Coleman or Bartlett. As to Bartlett and Coleman, they could have inspected the notes at any time that they had thought proper to call on Kribs to see them, and could have seen in what manner they were indorsed, and after they had money enough in Kribs' hands, which they claim they had on the evening of the 10th of October, Bartlett could have demanded the notes of Kribs, and if the notes had not been forthcoming, could have withdrawn his funds from Kribs' possession and protected himself in that way. But instead of doing so he chose not to instigate any investigation or demand his notes or demand a release of the mortgage which he claims was in the possession of Kribs, but intrusted the whole matter to Kribs and Coleman. Bartlett had no right to pay the notes to any one not the owner without seeing them and demanding them. He knew that E. S. Wilcox was not the owner of the notes, and he knew the notes were not paid and would not be unless Kribs or himself paid them; hence even a release from E. S. Wilcox, without demanding the notes upon payment, would not protect him,

although it might an innocent purchaser of the land, a stranger to the transaction who, in good faith, purchased from seeing the record of a release from the grantee in a mortgage. But what excuse could there be for Bartlett, the maker of the notes, who had a right to demand them when paid, to trust their payment and cancellation to Kribs and Coleman without even demanding to see them? Bartlett did not only not demand his notes from Kribs on the settlement of October 10, 1873, made in the latter's office with himself and Coleman, but proceeded to deed the balance of the unsold lots to Kribs. Again, the notes had been put into Kribs' hands indorsed, and one of them was not due and the other was unpaid and with no equities existing against either of them when Kribs received them, and when he sold them to appellant. Kribs was Bartlett's agent to pay the notes and had been intrusted and empowered to do so—that agency remained even after the former had sold and transferred the notes to appellant, and there was nothing to hinder him from paying them after the 21st of October, the day the last one became due. Having the money placed in his hands for that purpose, it was his duty to do so, and failing in that duty, who should sustain the loss, the principals, Bartlett and Coleman, or an innocent party who had done no wrong or omitted no duty? The only *laches* that Kribs had been guilty of, prior to October the 10th, the time the money was placed in his hands with which to pay the notes, was in selling them to appellant, but the appellees could not complain of that, for the reason that the notes were not in his hands without right in J. S. Wilcox to withdraw or sell them at will, and the latter testifies he had authorized Kribs to sell them. No legal right of Bartlett and Coleman had thus far been violated, and it would cost them no more to pay the notes to the appellant than to Wilcox. The real wrong and injury done them was in the failure of their agent to use the money put in his hands to pay off the notes. Nor can we see that it changes the principle because he had formed the design to defraud them prior to the time they placed their money in his hands, and that he had put himself in an attitude, without their knowledge, to

carry out such design, nor that they supposed he had the notes in his hands when they gave him the money. Had Kribs been a mere stranger, and they attempting to pay off the notes to him supposing him to be the owner, or the agent of Wilcox, it was their duty before parting with their money to demand their production, failing to do which, the law would hold them guilty of such negligence as would throw the occurring loss on them, according to the principle "that where one of two persons must suffer loss, he, who by his negligent conduct made it possible for the loss to occur, must bear it." Anderson v. Warne, 71 Ill. 20. As to the duty of a party to refuse to pay without the production of the note, in such case see Keohane v. Smith, 97 Ill. 156; Ogle v. Turpin, 102 Ill. 148; Steele v. Stocker, 11 Bradwell, 143; Holmes v. Field, 12 Ill. 429; Meyers v. Moore, 28 Ill. 428. But in a case like this where the loss occurred on account of the fraud of one's own agent, the case is much stronger against him, for the principal is represented in his agent. Nor do we think it would change the result if, as appellees strenuously insist, J. S. Wilcox had left a complete release with Kribs to be delivered when the notes were paid: for the same duty would devolve on a party who was undertaking to pay the notes, to see to it that they were actually paid before accepting a release, the validity of which he knew depended upon the payment of the notes; and this rule would apply to all parties having such knowledge. The rule announced in Keohane v. Smith, *supra*, would apply here, and not that in Ogle v. Turpin, above.

We shall next examine whether any of the purchasers of any of the lots from Bartlett or Kribs, whose lots are sought to be made subject to this mortgage, stand in any better attitude than the first parties to the transaction.

The lots claimed to be subject to the mortgage and date of transfer are as follows: December 1, 1871, Bartlett deeded to Schoonhoven, and the latter, prior to sale, to W. F. Lynch, lots 1, 2 and the north one half of 3 and 4; the same date and same grantor, to H. Ainsworth, and now by will to Eliza Ainsworth, lots 5, 6 and 7 and south one half of 3 and 4. October 10, 1873, deed from Bartlett to W. S. Dougherty, lots

34 and 35; on same date by same grantor to John Nelson and the latter to Soderstrom, lot 24; on same date by same grantor to O. P. Mason, Nos. 18 and 20; on same date by same grantor to Lewis Schroeffner, lots 38, 39 and 40.   On January 3, 1874, Kribs to John Tanner, lots 8 and 9.  January, 1874, Kribs to James W. Covey, Nos. 26 and 27.   On June 30, 1874, Kribs to P. S. Bartlett, Nos. 11, 13 and 25; 1874, Kribs to Roxana Covey, Nos. 28 and 29.   Those parties who have lots deeded prior to the sale of October 10th, stand in no better attitude than the original parties, because at the time that their lots were deeded there was no pretense that there was any release, and they did not purchase with any such expectation.   What occurred afterward could not be set up by way of estoppel, because they did not purchase on the strength of any release; hence, only an actual release could benefit them.   As to those deeded on the day of sale, October 10th, and subsequently, all without exception knew of this Wilcox mortgage and trusted to Coleman, Bartlett or Kribs to see that the mortgage was satisfied, or took their word that it was satisfied, hence, none of them stand in any better attitude than Coleman, Bartlett or Kribs.   J. W. Covey and Lynch obtained releases from Kribs, as the assignee of the mortgage, which are void and no protection.   It is needless to say that those who derived title through Kribs can not claim any advantage by reason of that fact, because Kribs is the most culpable of all.

The two releases cover all the other lots, and it is not claimed, as to those purchasers, that they are liable to the mortgage.

The lots that are held liable to appellant's mortgage should be sold in the inverse order of their alienation, in accordance with the rule in Iglehart v. Crane, 42 Ill. 261.

It is ordered that the decree be reversed and the cause remanded with directions to the court below to enter a decree of foreclosure against the lots above named and held by this opinion to be subject to the mortgage, in favor of appellant, for the amount of his notes and interest, and that, as to all the lots named in the two releases above, not already dismissed, be held not subject to the mortgage, and that the

suit as to the owners thereof who are parties herein, be dismissed.

Reversed and remanded with directions.