**DuPAGE LUMBER AND HOME IM-PROVEMENT CENTER COMPA-NY, INC., Plaintiff,**

v.

**GEORGIA–PACIFIC CORPORATION, Defendant.**

**GEORGIA–PACIFIC CORPORATION, Plaintiff,**

v.

**FIRST WISCONSIN FINANCIAL COR-PORATION, et al., Defendants.**

**DuPAGE LUMBER AND HOME IM-PROVEMENT CENTER COMPA-NY, INC. et al., Plaintiff,**

v.

**GEORGIA–PACIFIC CORPORATION, et al., Defendants.**

**Bankruptcy Nos. 83 C 1077, 82 C 6768 and (82 B 9953). Adv. No. 82 A 3060.**

United States District Court, N.D. Illinois, E.D.

Oct. 25, 1983.

Fred R. McMorris, Wheaton, Ill., for Du-Page and West DuPage.

Nelson Hembree, Brown & Shinitzky, Chtd., Chicago, Ill., for James R. Green.

Clive Kamins, Chicago, Ill., for Merle B. Smith.

Richard M. Kohn, Terry F. Moritz, Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Ltd., P.C., Chicago, Ill., for First Wisconsin.

Ronald Wilder, Ann Rae Heitland, Sara L. Johnson, Schiff, Hardin & Waite, Chicago, Ill., for Georgia-Pacific.

## MEMORANDUM OPINION AND ORDER *

GETZENDANNER, District Judge.

The following parties are before the court in these related cases: DuPage Lumber and Home Improvement Center Company, Inc.

---

* In this opinion the court rules on several motions brought in three related cases. The parties have urged the court to submit its discussion of equitable marshaling for publication. Believing the rest of the opinion not to be of general interest, the court has submitted for publication only parts I.A and I.B of its opinion. Parts I.A and I.B are published without alteration.

("DuPage"); West DuPage Building Corporation ("West DuPage"); James R. Green ("Green"); Merle B. Smith ("Smith"); First Wisconsin Financial Corporation ("First Wisconsin"); and Georgia-Pacific Corporation ("Georgia-Pacific"). Smith is sued in No. 82 C 6768 "individually and d/b/a MBS Enterprises, Inc." ("MBS").

Federal subject-matter jurisdiction is based on 28 U.S.C. § 1332. Georgia-Pacific is a citizen of Georgia. First Wisconsin is a citizen of Wisconsin. DuPage, West DuPage, Green, and Smith are citizens of Illinois; they are not adverse parties in any of these actions. The amount in controversy in all cases exceeds $10,000.[1]

## I. MOTIONS DIRECTED AT GEORGIA-PACIFIC'S COMPLAINT IN No. 82 C 6768

First Wisconsin has answered Georgia-Pacific's Amended Complaint in No. 82 C 6768, and has filed a counterclaim. DuPage, West DuPage, Green, and Smith all have moved to dismiss the Amended Complaint.

### A. Facts

Georgia-Pacific's well-pled allegations are taken as true, insofar as the motions test the legal sufficiency of Georgia-Pacific's claims. Those allegations include the following. MBS was a corporation wholly owned by Smith. It was not in good standing at times relevant to this action and was dissolved in December 1981. MBS and Green are the shareholders of DuPage and of West DuPage.

DuPage is a corporation which has been in the business of selling lumber and related supplies and products. West DuPage is a corporation which owns the land and buildings comprising DuPage's principal place of business.

From 1971 until the middle of 1982, Georgia-Pacific sold lumber products to DuPage. In 1977, as security for credit purchases from Georgia-Pacific, DuPage granted Georgia-Pacific a security interest in DuPage's inventory and accounts receivable. Georgia-Pacific also received an unsecured guaranty from West DuPage.

In 1978, First Wisconsin lent money and otherwise extended credit to DuPage. To secure its obligations to First Wisconsin, DuPage granted First Wisconsin a security interest in DuPage's inventory and accounts receivable.[2] In addition, Green and Smith guaranteed DuPage's obligations to First Wisconsin. As further security, First Wisconsin was granted a second mortgage on West DuPage's real estate.[3]

In early 1979 Georgia-Pacific executed a subordination agreement, whereby its security interest in DuPage's inventory and accounts receivable would be subordinated to the security interest held by First Wisconsin.

Most, but not all, of the foregoing allegations are incorporated into all six counts of Georgia-Pacific's Amended Complaint.

---

1. This court is bound to follow the choice-of-law rules that would be applied in this case by the Illinois courts. *Klaxon Co. v. Stentor Electric Mfg.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The Illinois courts use a "most significant contacts" test for tort cases, and there may be a trend toward applying that test in contract cases as well. Even under the traditional test, a multi-faceted situation may warrant selection of the law of the state with the most significant contacts. *Zlotnick v. MacArthur*, 550 F.Supp. 371, 373–74 & n. 2 (N.D.Ill. 1982). The court believes that all issues presented by these motions should be decided under Illinois law. The parties appear to have assumed that Illinois law governs all questions presented here. Illinois clearly is the state having the most significant contacts with this litigation, and the contracts in issue present the

kind of multi-faceted situation that calls for use of a "most significant" contacts test, even under the traditional framework.

2. First Wisconsin's security interest is defined in somewhat broader terms than is Georgia-Pacific's security interest. For instance, First Wisconsin is granted a security interest in DuPage's equipment, while Georgia-Pacific is not. The parties have not made an issue of this difference, and the court treats it as immaterial to the sufficiency of Georgia-Pacific's marshaling claim.

3. Georgia-Pacific alleges that First Wisconsin's second mortgage on West DuPage's real estate later became security for a loan to West DuPage, as well as for the loans made to DuPage.

## B. Count I

In Count I Georgia-Pacific alleges that DuPage's inventory and accounts receivable will not be sufficient to satisfy First Wisconsin's claims. Georgia-Pacific seeks "judgment against First Wisconsin, Green, Smith and West DuPage for equitable marshalling," mainly in the form of an order requiring First Wisconsin to satisfy its claims against DuPage and West DuPage out of the guaranties given by Smith and Green, before resorting to DuPage's inventory or accounts receivable.

On November 22, 1982, the court entered an order sustaining the sufficiency of Georgia-Pacific's marshaling claim, as asserted in its original complaint in this action. The court stated:

Whether the assets of third parties such as officers and shareholders of the debtor will be the subject of a marshalling of assets depends on the equities of the various parties. This requires a hearing and may not be determined in a motion to dismiss.

At that time only First Wisconsin and DuPage were defendants. The other defendants argue that the court should reconsider the question de novo, as they were not parties at the time the court made its ruling. The court agrees with the newly-added defendants, and decides that Georgia-Pacific's marshaling claim is insufficient as a matter of law.

■ The general rule of marshaling assets, as stated long ago by the Illinois Supreme Court, is:

where there are two creditors standing in equal equity, one of whom has security upon two funds, and the other upon only one of the two, the former is required to proceed primarily against the fund upon which the latter has no claim.

*Boone v. Clark,* 129 Ill. 466, 480–81, 21 N.E. 850 (1889), *quoting Iglehart v. Crain,* 42 Ill. 261, 265 (1866). It is well established, as part of the general rule, that both funds must be in the hands of a debtor common to the two creditors. *Boone v. Clark,* 129 Ill. at 481, 21 N.E. 850; 53 Am.Jur.2d *Marshaling Assets* § 9 (1970).

■ The requirement that both funds be in the hands of a common debtor bars marshaling when the singly-charged fund is in the hands of a stockholder of the common debtor:

Inasmuch as a corporation is an entity distinct from its stockholders, as between a junior creditor of the corporation and a senior creditor who can also resort to the stockholders the necessary condition of a common debtor does not exist.

53 Am.Jur.2d *Marshaling Assets* § 10 at 16 (footnote omitted). The requirement that both funds be in the hands of the common debtor also bars marshaling when the singly-charged fund is in the hands of a surety:

The property of a surety is not a fund in the hands of the common debtor so as to permit or require marshaling by compelling the senior creditor to first proceed against such property.

*Id.* at 17 (footnote omitted). The equity of the surety sometimes is said to be "paramount," defeating a junior creditor's demand for marshaling. 37 A.L.R. 1262, 1266–67 (1925). *See also* 135 A.L.R. 738 ("cases seem to be in full accord"), 744 (rule applicable also to stockholder-sureties) (1941). These rules are well established. Of equally long standing, however, is the recognition that marshaling may be justified, even when the singly-charged fund is in the hands of a debtor other than the common debtor, if there exist separate and independent equities, such as where "the relation between the debtors be such as to make it equitable." *Wise v. Shepherd,* 13 Ill. 41, 47 (1851); 53 Am.Jur.2d *Marshaling Assets* § 11 at 17.

■ The requirement that both funds be in the hands of a common debtor is not merely a formal or technical requirement; rather, it limits marshaling to cases for which the marshaling doctrine purports to provide the rule of decision. The marshaling doctrine embodies and implements a judgment as to the proper distribution of one debtor's assets, as among a senior mortgagee, a junior mortgagee, and the debtor's

general creditors. When guarantors and other debtors are added to the picture, then new questions arise. The marshaling doctrine simply does not purport to provide a rule for deciding whether a junior mortgagee can require the senior mortgagee to satisfy its claim out of the assets of a second debtor.

It is not surprising, therefore, that the techniques for avoiding the single-debtor rule allow the court to proceed as though only a single debtor were involved. Perhaps the most frequently suggested basis for marshaling funds not held by the same debtor relates to disregarding the separate existence of a corporate debtor, in effect treating the corporate debtor and its shareholders as one debtor. *Port Welcome Cruises, Inc. v. S.S. Bay Belle,* 215 F.Supp. 72, 85 (D.Md.), *aff'd without opinion,* 324 F.2d 954 (4th Cir.1963); 53 Am.Jur.2d *Marshaling Assets* § 10 at 16. Although Georgia-Pacific asks the court to disregard DuPage's corporate existence in Count II (¶¶ 18–20), it does not ask the court to use this technique in connection with its marshaling claim in Count I.[4] Instead, Georgia-Pacific proposes that the court treat Smith's and Green's guaranties as contributions to DuPage's corporate capital. (Count I ¶ 19.) This technique too would allow the court to proceed as though DuPage were the only debtor whose assets were involved.

Georgia-Pacific relies on three cases which avoid the single-debtor rule in ordering marshaling: *Berman v. Green (In re Jack Green's Fashions for Men—Big and Tall, Inc.),* 597 F.2d 130 (8th Cir.1979); *In re Multiple Services Industries, Inc.,* 18 B.R. 635 (Bkrtcy.E.D.Wis.1982); *Farmers & Merchants Bank v. Gibson,* 7 B.R. 437 (Bkrtcy.N.D.Fla.1980). In *Jack Green's* the senior creditor had a lien on the business assets of the corporate debtor, and also on

certain real estate owned by the controlling stockholders and their wives. The trustee in bankruptcy sought an order requiring the senior creditor to resort first to the real estate, which could not be reached by general creditors of the corporate debtor. The requested marshaling order was entered by the bankruptcy judge, and was affirmed in turn by the District Court and, in the cited opinion, by the Court of Appeals. *Jack Green's* is the least helpful of Georgia-Pacific's cases, because it contains no discussion of the apparently unfulfilled requirement that both funds be held by the common debtor. The Court of Appeals referred to a "full but unpublished memorandum" entered by the District Court, *Id.* at 132, and it is possible that this requirement merely was omitted from the appellate court's discussion, rather than ignored altogether. In any event, *Jack Green's* offers no reasoning on this point.

In Georgia-Pacific's other two cases, *Farmers* and *Multiple Services,* the courts used the technique advanced here by Georgia-Pacific, and treated the singly-charged fund as having been contributed to the common debtor's corporate capital. This technique was borrowed, by both bankruptcy courts, from two Wisconsin cases: *Moser Paper Co. v. North Shore Publishing Co.,* 83 Wis.2d 852, 266 N.W.2d 411 (1978), and *C. Gotzian & Co. v. Shakman,* 89 Wis. 52, 61 N.W. 304 (1894).

In *Farmers* the senior creditor was secured by a mortgage on the corporate debtor's real estate and also by a mortgage upon certain real estate, including a residence, owned by the corporate president and his wife. The trustee in bankruptcy sought marshaling to protect the corporate debtor's general creditors. The court recognized the general rule requiring that both funds be in the hands of the common debtor, but then

---

4. On the facts alleged in Count I, piercing the corporate veil probably would defeat Georgia-Pacific's marshaling claim, at least with respect to Green and Smith. It appears that Green and Smith have given First Wisconsin their general guaranties, not secured by any particular property they may own. If the court disregards the separate corporate existence of DuPage (and

that of MBS), then Georgia-Pacific and First Wisconsin will have equal access to Green's and Smith's assets, and marshaling will not be necessary. That the allegations of Count II ¶¶ 18–20 may be inconsistent with the marshaling claim of Count I is not objectionable. Fed. R.Civ.P. 8(e)(2).

proceeded to find additional equitable considerations justifying a departure from the rule. The court noted that the loan made by the senior creditor, guaranteed by the corporate president and his wife, was made for the purpose of securing working capital for the business. The court observed that:

> the foreseeable and likely result of obtaining such working capital, partly on the strength of the guarantor's personal liability and any property which the guarantor may have specifically pledged to secure such guaranty, is the inducement of others to innocently commence or continue to extend supplies or services to the principal on credit.

7 B.R. at 441. The court held that the equities of the case called for treating the guaranty as a contribution to the corporate debtor's corporate capital, and the court ordered marshaling (by way of subrogation) in favor of the general creditors, as represented by the trustee in bankruptcy. *Id.* at 443.

In *Multiple Services* the corporate debtor's trustee in bankruptcy sought marshaling with respect to a residence apparently owned by a stockholder or officer of the corporate debtor. 18 B.R. at 636. The court quoted the above-quoted discussion of working-capital loans, and ordered marshaling. *Id.* at 636–37.

*Jack Green's* and *Farmers* have been criticized severely. *Stuhley v. United States Small Business Administration (In re United Medical Research, Inc.),* 12 B.R. 941 (Bkrtcy.C.D.Cal.1981). One court has criticized these cases for ordering marshaling in favor of general creditors (represented by the trustee in bankruptcy), instead of limiting the availability of marshaling to junior secured creditors. *In re Computer Room, Inc.,* 24 B.R. 732, 735 n. 5 (Bkrtcy.N.D.Ala. 1982). This criticism is not applicable to the present case, since Georgia-Pacific is a junior secured creditor, but emphasis on the position of the general creditors in those cases highlights an important basis for distinguishing *Farmers* and *Multiple Services.* In *Farmers* and *Multiple Services* the courts were particularly concerned that the working-capital loans, secured by guaranties and privately-owned real estate, could deceive trade creditors by giving the illusion of adequate capitalization. Georgia-Pacific's allegations do not allow the inference that this type of deception could have occurred in this case. Georgia-Pacific was not a casual supplier extending unsecured credit merely on the appearance of adequate working capital. Georgia-Pacific had a first lien on DuPage's inventory and accounts receivable, and Georgia-Pacific agreed in writing to subordinate its security interest to that of First Wisconsin to enable DuPage to obtain additional financing. Georgia-Pacific does not allege that it was unaware of the guaranties running to First Wisconsin, and the nature of Georgia-Pacific's involvement makes it impossible for the court to infer that Georgia-Pacific might have been deceived by an appearance of adequate working capital. If the holdings of *Farmers* and *Multiple Services* are correct—a point on which the court expresses no opinion—it is because ordinary trade creditors arguably should be enabled to rely on a low-cost method of ascertaining creditworthiness, such as by checking for the appearance of adequate working capital. When a trade creditor becomes a secured creditor, and then becomes involved with the debtor's finances to the extent of executing a written subordination agreement, it does not seem that the law should be extended to encourage that creditor to rely merely on an appearance of adequate working capital. The court concludes that the reasoning of *Farmers* and *Multiple Services* is inapplicable to Georgia-Pacific's claim for marshaling.

The Wisconsin cases themselves are somewhat different from *Farmers* and *Multiple Services.* The older of the cases, the *Shakman* case, bears little resemblance to the present case. The allegations of the complaint—which were taken as true, since the case was on appeal from an order sustaining the defendant's general demurrer—reveal a history of collusion and fraudulent conveyances. Georgia-Pacific's Count I contains no comparable allegations. Among other distinguishing features of the

*Shakman* case, it appears that the common debtor was a partnership, not a corporation, and that the second debtor, a partner therein, had borrowed the money from the senior creditor on his own account for the purpose of making his required contribution to the partnership, and thus did not stand in the position of a surety. The partner had given the senior creditor mortgages on certain of his real estate, and the Supreme Court of Wisconsin held that the mortgages should be treated as a capital contribution to the firm. By this approach, the court ensured that the partner, who was required by the partnership agreement to make a certain capital contribution, in fact would make that contribution; the effect of the court's holding was not to deem the partner as having contributed more than the amount stated in the partnership agreement. 89 Wis. 52, 61 N.W. 304.

Closer to the facts alleged here, but still distinguishable, is the more recent *Moser* case. In *Moser,* Polka and Frey were the principal shareholders of the North Shore Publishing Company. Midland, the senior creditor, had loaned money to Polka, Frey, and North Shore, and it held a security interest in North Shore's property. When North Shore ran into difficulties, additional financial arrangements were worked out. Polka and Frey guaranteed North Shore's corporate obligations to Midland and also borrowed money on their own account, from Midland, for use as corporate working capital. In addition, Polka and Frey guaranteed North Shore's corporate obligations, and North Shore guaranteed Polka's and Frey's obligations. Polka, Frey, and their wives executed mortgages on their residences, each mortgage stating that it served to secure the obligations of both the individual debtors and North Shore. 266 N.W.2d at 413–14. An unsecured creditor of North Shore reduced its claim to judgment, and then sought to require Midland to resort first to the residences. The court was particularly impressed that the mortgages, by their language, secured North Shore's obligations directly, rather than merely as collateral for Polka's and Frey's guaranties. The court acknowledged the

general rule that marshaling is possible only where the funds both are in the hands of the common debtor, and then stated:

> But here a superior equity exists. The residences of Polka and Frey are more than the property of a "surety." The mortgages secure the aggregate obligations of North Shore, Polka, and Frey directly. The value of the two residences are a fund out of which the North Shore's obligation to Midland can be primarily satisfied.

266 N.W.2d at 417. In discussing the equities of the case, the court noted that the additional financing was used as working capital and had enabled North Shore to continue its operations until it finally was purchased. The court went on to state:

> Most important of all, the mortgages executed by the Freys and the Polkas by their very terms secured the obligations of North Shore directly. Although record title to the residences remained in the hands of Polka and Frey, in the eyes of equity the Polkas and the Freys had placed their residences in the company till.

266 N.W.2d at 417–18. Relying on *Shakman,* the court deemed the mortgages to be contributions to North Shore's capital, and it ordered marshaling to the extent possible without injuring Midland's interests.

*Moser* does not provide adequate support for Georgia-Pacific's marshaling claim. It should be noted that while Polka and Frey had guaranteed North Shore's obligations, the court did not suggest that the guaranties should be treated as capital contributions, even though it discussed the possibility that the Polkas' and the Freys' equity in their residences would not satisfy Midland's claims. 266 N.W.2d at 414, 418. In the present case, Georgia-Pacific alleges only unsecured guaranties from Green and Smith. These guaranties fall outside the holding of *Moser.* Georgia-Pacific does allege that "First Wisconsin received a second mortgage on West DuPage's real estate as further security for the indebtedness owed by DuPage." (Count I ¶ 15.) This allegation might appear to bring the West Du-

Page mortgage within the holding of *Moser*. The 1982 amendment to that mortgage, however, describes the mortgage not as securing DuPage's indebtedness directly, but rather as securing West DuPage's "unlimited guaranty" of that indebtedness. (Amended Complaint, Ex. F. The original mortgage is not appended to the Amended Complaint.) The court will treat the West DuPage mortgage as securing a guaranty, rather than DuPage's indebtedness directly, taking the West DuPage mortgage outside the holding of *Moser*. While the Amended Complaint is ambiguous on this point, Exhibit F seems to be the more reliable indicator of what Georgia-Pacific is alleging. The court is not certain that it would apply *Moser* even if Georgia-Pacific did allege clearly that the West DuPage mortgage secured DuPage's indebtedness directly. Unlike Frey and Polka with respect to North Shore, West DuPage is not a principal shareholder of DuPage. Further, it is questionable whether the Illinois courts would elect to follow *Moser*. The court need not reach questions such as these because of its construction of paragraph 15 of Count I.

■ Georgia-Pacific's marshaling claim therefore is insufficient as a matter of law. The allegations of Count I, if proved at trial, might support a finding of sufficient equity on Georgia-Pacific's part to entitle it to marshaling if the usual prerequisites to marshaling were present. Marshaling is possible only when the two funds are in the hands of the common debtor, however, unless separate and independent equities are present. No separate and independent equities are alleged in Count I. Georgia-Pacific does allege that "[t]he personal guaranties of Smith and Green in equity constitute contributions to the capital stock of DuPage," (Count I ¶ 19), but this conclusory allegation is not supported by allegations of the kind of facts that have been held to support such a finding in the cases discussed above.

Georgia-Pacific makes an argument, relevant to the question of separate and independent equities, that is supported only with citations to law review articles. Georgia-Pacific's argument is that it should be deemed a surety by virtue of its agreement to subordinate its security interest to that of First Wisconsin. Since the equity of a surety is said to be paramount, Georgia-Pacific argues, its equity equals that of DuPage's guarantors, removing the reason for the bar against marshaling.

The articles cited by Georgia-Pacific are: Coogan, Kripke, and Weiss, *The Outer Fringes of Article 9: Subordination Agreements, Security Interests in Money and Deposits, Negative Pledge Clauses and Participation Agreements,* 79 Harv.L.Rev. 229, 251 (1965); Everett, *Subordinated Debt—Nature, Objectives and Enforcement,* 44 B.U. L.Rev. 487, 500, 529–30 (1965); Calligar, *Subordinated Agreements,* 70 Yale L.J. 376, 394, 400 (1961). The court has reviewed the passages cited by Georgia-Pacific. These articles all suggest that subordinated creditors should be treated as sureties, or analogized to sureties, for some purposes. None of the articles addresses the situation presented here, in which there is a subordinated creditor seeking to require the senior creditor to satisfy its claim primarily out of the assets of guarantors.

Even assuming that these articles call for according Georgia-Pacific the equity traditionally recognized in a surety, a claim for marshaling still is not stated. Missing from Georgia-Pacific's analysis is any indication that marshaling is available as among sureties. Treating Georgia-Pacific as a surety might counter the supposedly paramount equity of Green and Smith, but it still would not bring the facts alleged within the scope of the marshaling doctrine.

Georgia-Pacific's argument boils down to an assertion that a junior lienor can require a senior lienor to resort first to a surety, contrary to the usual marshaling rule, if the priority of liens is the result of the junior lienor's subordination of its lien to that of the senior lienor. Georgia-Pacific cites no precedent for such a holding, and the court is not inclined to set such a precedent. There is no allegation that Georgia-Pacific was unaware of the guaranties, and it con-

ceivably could have bargained for guaranties of its own claims against DuPage in connection with the subordination agreement. It is better, in the court's view, to require a subordinating lienor to bargain for some accommodation from the guarantors, rather than making such accommodation flow, as a matter of law, from the subordination agreement. The court expresses no view as to what result would be proper if Georgia-Pacific did allege it was unaware of the guaranties.

