**GEORGIA–PACIFIC CORPORATION, a Georgia corporation, Plaintiff,**

**v.**

**FIRST WISCONSIN FINANCIAL CORPORATION, a Wisconsin corporation, et al., Defendants.**

**No. 82 C 6768.**

United States District Court, N.D. Illinois, E.D.

Oct. 21, 1992.

Steven L. Bashwiner, Mary Ellen Hennessy, Katten, Muchin & Zavis, Chicago, Ill., for plaintiff Georgia–Pacific Corp.

Timothy Frank Kocian, Katz, Randall & Weinberg, Chicago, Ill., for defendants West DuPage Building Corp. and James R. Green.

Alan P. Solow, William C. Meyers, Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Ltd., Chicago, Ill., for defendant First Wisconsin Financial Corp.

Herbert Beigel, Laurence M. Landsmen, Beigel & Sandler, Chicago, Ill., for defendant Dupage Lumber & Home Improvement Center Co.

Clive D. Kamins, Morrison, Kamins & Saltz, Chicago, Ill., for defendant Merle B. Smith.

Bradford P. Lyerla, Keith F. Bode, Jenner & Block, Chicago, Ill., for third-party defendant Schiff Hardin & Waite.

## MEMORANDUM AND ORDER

MORAN, Chief Judge.

This is one of several cases that have come before the court involving Georgia–Pacific Corporation (Georgia–Pacific), First Wisconsin Financial Corporation (First Wisconsin), DuPage Lumber and Home Improvement Center Company, Inc. (DuPage), West DuPage Building Corporation (West DuPage), James Green (Green), and Merle Smith (Smith).[1] In its complaint, plaintiff Georgia–Pacific alleges that First Wisconsin, the senior secured lender to DuPage, improperly disposed of collateral and breached the subordination agreement entered into by Georgia–Pacific and First Wisconsin.[2] First Wisconsin now moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. For the reasons stated below, defendant's motion is granted.

Federal subject matter jurisdiction is based on 28 U.S.C. § 1332, the parties being of diverse citizenship and the amount in controversy exceeding $50,000.

### FACTS

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Renovitch v. Kaufman*, 905 F.2d 1040, 1044 (7th Cir. 1990). The movant has the burden of demonstrating lack of a genuine issue of material fact. *Celotex Corporation v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In assessing a motion for summary judgment we examine the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," resolving all doubts in favor of the non-movant. Fed. R.Civ.P. 56(c). For that purpose we are "not required to draw every conceivable inference from the record—only those inferences that are reasonable," in favor of the non-movant. *Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.

---

1. *See e.g. DuPage Lumber and Home Improvement Center Company, Inc. v. Georgia–Pacific Corporation*, 34 B.R. 737 (N.D.Ill.1983). The court held that the junior creditor with a secured interest in the same collateral could not require the senior creditor to resort to its guarantors before secured property.

    *Georgia–Pacific v. First Wisconsin Financial Corporation*, 625 F.Supp. 108 (N.D.Ill.1985). The court held that: (1) buyer stated claim under Illinois law for breach of sale agreement;

(2) buyer stated claim for breach of good faith and fair dealing; (3) buyer lacked standing to sue on subordination agreement; (4) buyer stated claim for tortious interference with its account debtor; and (5) buyer stated claim against seller for defamation.

2. Georgia–Pacific's complaint includes other allegations against DuPage, West DuPage, Green and Smith, none of which is relevant to First Wisconsin's motion.

1991). The facts recited reflect the above standard. Because the facts have been stated in detail in earlier opinions, we offer only a brief recitation of the facts here.[3]

Beginning in the 1970s and continuing into the early 1980s, DuPage purchased substantial amounts of lumber and other building products from Georgia–Pacific. On August 1, 1977, DuPage and Georgia–Pacific entered into a security agreement wherein DuPage granted Georgia–Pacific a security interest in DuPage's inventory and accounts receivable.

On or about October 27, 1978, DuPage granted First Wisconsin a security interest in all of its existing and future accounts receivable and inventory. This agreement provided that

[w]ithout [First Wisconsin's] written consent, [DuPage Lumber] shall not permit the aggregate amount of Obligations at any time outstanding to exceed the lesser of the total sum of *$7,000,000.00* or:

(a) *70%* of the amount owing on Qualified Accounts (including payments on Qualified Accounts which are in the process of collection by the Corporation and for which the [DuPage Lumber] has not received credit); plus

(b) the lesser of the sum *$2,400,000.00* or *60%* of Qualified Inventory at cost or wholesale market value, whichever is lower, the percent advanced on Qualified Inventory to be reduced xxxxxxx% per month during the term of this agreement.

In addition to other required payments, [DuPage Lumber] shall pay [First Wisconsin] in reduction of the Obligations such sums as may be necessary from time to time to maintain the foregoing ratios.

In order to induce First Wisconsin to make and renew loans, and in order to extend further credit to DuPage, Georgia–Pacific entered into a subordination agreement with First Wisconsin in February 1979. Under the agreement Georgia–Pacific agreed to subordinate any security interest it then held or thereafter acquired in DuPage's inventory, accounts receivable and proceeds of the inventory and accounts receivable. In addition, Georgia–Pacific authorized First Wisconsin to "collect, receive, enforce and accept any and all sums" becoming due on the property. Nevertheless, Georgia–Pacific remained free to demand payment of DuPage's debts in the ordinary course of business.

According to Georgia–Pacific, First Wisconsin loaned funds to DuPage in excess of the terms of the loan agreement between DuPage and First Wisconsin. In February 1982, First Wisconsin loaned West DuPage $500,000 and amended the mortgage on the West DuPage property in order to secure West DuPage's obligation to First Wisconsin. West DuPage then loaned the proceeds of this loan to DuPage. First Wisconsin did not inform Georgia–Pacific of the additional advances to DuPage or of the $500,000 loan to West DuPage.

After making several attempts to collect amounts owed from DuPage, Georgia–Pacific sent notices of claims to DuPage's account debtors in July 1982. On or about July 20, 1982, First Wisconsin sent DuPage notice of default under the loan agreement demanding payment of the $1,200,000 loan and surrender of DuPage's accounts receivable and inventory.[4] On July 27, 1982, Georgia–Pacific notified First Wisconsin, pursuant to terms of the subordination agreement, that it was terminating that agreement. On July 30, 1982, DuPage filed its petition under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101, *et seq.*

First Wisconsin obtained an order from the Bankruptcy Court modifying the automatic stay. Under the order First Wiscon-

---

**3.** See *Georgia–Pacific Corp. v. First Wisconsin Financial Corp.,* 625 F.Supp. 108 and *DuPage Lumber and Home Improvement v. Georgia–Pacific Corp.,* 34 B.R. 737 for complete factual discussion.

**4.** On or about July 22, 1982, Dupage filed a complaint seeking a temporary restraining or-

der to prevent Georgia–Pacific from perfecting the notices of claims. First Wisconsin intervened in that case. On July 23, 1982, the court issued a preliminary injunction preventing Georgia–Pacific from taking any further actions to enforce its notice claims (plf. memo at 10).

sin received permission to foreclose on Du-Page's collateral. On September 24, 1982, First Wisconsin held a sale of the collateral at a public auction at the Gary–Wheaton Bank in Wheaton, Illinois. Notice of the sale was given to DuPage, Georgia–Pacific and the Creditors' Committee, an official committee comprised of DuPage's unsecured creditors. First Wisconsin advertised the sale for several days in the *Chicago Tribune* and the *Milwaukee Journal and Sentinel.* David Gronik (Gronik) conducted the auction by open bid. Gronik estimated the value of the accounts receivable and inventory, but did not perform an appraisal. Potential buyers were given the opportunity to inspect the inventory the weekend prior to the sale. Representatives of First Wisconsin and Georgia–Pacific were present at the auction.

First Wisconsin purchased DuPage's accounts that had a face value of approximately $2,000,000 for $500,000 and DuPage's inventory with a book value of $800,000 for $120,000. Prior to the sale First Wisconsin had communicated with DuPage and its Creditors' Committee. They agreed that if First Wisconsin was the purchaser of any of the property or accounts at the auction that any amount received from a subsequent sale of the accounts or inventory, in excess of the amount paid by First Wisconsin at the auction, would be applied to reduce DuPage's obligations. First Wisconsin further agreed that if a subsequent sale of the accounts or inventory reaped more than the balance due on DuPage's obligations, then it would return any such excess to DuPage.

Following its purchase of the accounts and inventory First Wisconsin hired Green to dispose of the inventory and to collect from DuPage's customers on their accounts. First Wisconsin collected more than it had paid for the collateral and credited this excess against the deficiency owed to it from DuPage. The amount ultimately collected, however, was less than the amount First Wisconsin was owed.

In its second amended complaint Georgia–Pacific makes two allegations against First Wisconsin. First, Georgia–Pacific al-leges that First Wisconsin breached the subordination agreement. Georgia–Pacific claims that (1) Georgia–Pacific agreed to subordinate its security interest in reliance on First Wisconsin safeguarding the First Wisconsin–DuPage loan agreement and that First Wisconsin failed to do so; (2) the $500,000 loan to West DuPage was actually a means of funneling money to DuPage and violated the First Wisconsin–DuPage loan agreement; (3) First Wisconsin did not sell the collateral in a commercially reasonable manner as required by § 9–504 of the Illinois Uniform Commercial Code; (4) First Wisconsin failed to account to Georgia–Pacific for the sale of accounts and inventory; and (5) that accounts were not diligently pursued by Green, whom First Wisconsin had hired for collection purposes. Second, Georgia–Pacific alleges that First Wisconsin breached its fiduciary duty to Georgia–Pacific in a variety of ways. Specifically, Georgia–Pacific claims that First Wisconsin did not (1) perform a commercially reasonable sale, (2) account to Georgia–Pacific, and (3) perfect liens on the assets.

First Wisconsin moves for summary judgment on Georgia–Pacific's first claim and maintains that it did not breach the subordination agreement. In support of its motion First Wisconsin claims that (1) First Wisconsin was not required to inform Georgia–Pacific of modifications in its loan agreement with DuPage; (2) that even if the $500,000 loan to West DuPage were considered a disguised loan to DuPage, it would not have violated the subordination agreement, because the subordination agreement did not limit the amount that could be loaned to DuPage and, further, that DuPage's guarantee of the West DuPage loan was a contingent liability that was covered in the subordination agreement; (3) that the collateral was sold in a commercially reasonable manner in accordance with U.C.C. § 9–504; (4) that no accounting to Georgia–Pacific was necessary since § 9–504 requires an accounting to the *debtor* only if there is a *surplus* and Georgia–Pacific was not the debtor and there was no surplus; and (5) that Georgia–Pacific has no basis to dispute Green's collection

of the accounts because collection was performed after the U.C.C. sale at which time Georgia–Pacific's security interest was discharged and, in addition, Georgia–Pacific has provided no evidence that Green's involvement in the collection procedure diminished the amount of money ultimately received on the accounts. First Wisconsin also moves for summary judgment on Georgia–Pacific's second claim that First Wisconsin breached its fiduciary duty. First Wisconsin argues that it was not a fiduciary because Georgia–Pacific was not a surety or guarantor. First Wisconsin also contends that because it disposed of the collateral in a commercially reasonable fashion, any potential fiduciary obligation it might have had to junior creditors was fulfilled.

## DISCUSSION

In its complaint plaintiff makes numerous allegations in support of its claims that First Wisconsin breached the subordination agreement and its fiduciary duty to Georgia–Pacific. In this opinion we focus solely on the controlling issues and avoid digressions on other points mentioned by the parties that have no bearing on whether First Wisconsin acted appropriately when it sold the collateral or whether it breached its contract with Georgia–Pacific. Therefore, we narrow this case to two issues. First, did First Wisconsin breach the subordination agreement with Georgia–Pacific either when it made loans to DuPage and West DuPage or when it sold the collateral at the auction? Second, did First Wisconsin have a fiduciary duty to Georgia–Pacific and, if it did, were its obligations fulfilled when the DuPage collateral was sold?

A. *Breach of the Subordination Agreement*

First we address whether First Wisconsin breached the subordination agreement when it made loans to DuPage and West

5. The subordination agreement reads in part as follows:

In order to induce [First Wisconsin] to make and renew loans and extend credit to [DuPage], in such manner and amounts and upon such terms and conditions as [DuPage] and

DuPage which allegedly fell outside the lending limits of the First Wisconsin–DuPage loan agreement. Georgia–Pacific claims that First Wisconsin breached the subordination agreement because First Wisconsin (1) made overadvances to DuPage; (2) failed to maintain safeguards in the loan agreement, including lending ratios, upon which Georgia–Pacific relied when it agreed to the subordination agreement; and (3) made a hidden loan to DuPage in the form of a $500,000 loan to West DuPage, the proceeds being immediately transferred to DuPage.

The language of a contract must be examined to determine the rights and obligations of the parties. When its terms are clear and unambiguous, the plain language of the contract controls and it must be enforced as written. *U.S. v. Crispen,* 622 F.Supp. 75, 78–79 (N.D.Ill.1985); *Ford Motor Credit Co. v. DeValk Lincoln–Mercury, Inc.,* 600 F.Supp. 1547, 1550 (N.D.Ill. 1985). When a contract is unambiguous on its face, the meaning of the document and intentions of the parties must be gathered from the face of the instrument without the assistance of parol or extrinsic evidence. *Dribeck Importers, Inc. v. G. Heileman Brewing Co., Inc.,* 883 F.2d 569, 573 (7th Cir.1989); *Sunstream Jet Express, Inc. v. International Air Service Co., Ltd.,* 734 F.2d 1258, 1265–66 (7th Cir. 1984). "Summary judgment based on the plain meaning of the contract is appropriate regardless of whether a party claims some other intent when the contract was drafted." *Id.* (citation omitted).

In this case, the language of the subordination agreement is clear and unambiguous. The terms of the agreement explicitly permitted First Wisconsin to determine the amount of credit to be extended and to establish the terms and conditions of DuPage's obligations to First Wisconsin.[5] The subordination agreement did

[First Wisconsin] may from time to time agree and to better secure [First Wisconsin] in respect to [DuPage's] obligations and liabilities to [First Wisconsin] arising in connection with such loans ... [Georgia Pacific] does hereby subordinate any security interest it

not incorporate the conditions, ratios or lending limits that had been included in the First Wisconsin–DuPage loan agreement. Further, Georgia–Pacific did not reserve the right to be kept informed of transactions between or decisions made by First Wisconsin and DuPage with respect to their loan agreement. *See, e.g., Home Savings Association of Kansas City, F.A. v. State Bank of Woodstock,* 763 F.Supp. 292, 297 (N.D.Ill.1991) (finding that violation of loan agreement did not result in violation of subordination agreement because terms of loan agreement had not been incorporated into subordination agreement).

Therefore, Georgia–Pacific's allegations that First Wisconsin breached the subordination agreement because it did not inform Georgia–Pacific when it modified the lending ratios and made additional loans (overadvances) to DuPage are without merit. First Wisconsin had no obligation to notify Georgia–Pacific of any adjustments to the ratios or terms of the First Wisconsin–DuPage loan agreement. In fact, the subordination agreement expressly provided First Wisconsin with the authority to make modifications and changes to the loan agreement.[6]

Georgia–Pacific's primary case support, *Ranier v. Mount Sterling Nat'l Bank,* 812 S.W.2d 154 (Ky.1991), depicts a situation significantly different than the one before us. The subordination agreement in *Ranier* mentioned the amount of the loan which was the subject of subordination. Because loans were made in excess of the amount stated in the subordination agreement, the *Ranier* court held that the bank breached its implied covenant of good faith and fair dealing since it did not give notice of the subsequent loans to the subordinated party. That is not the case here. The subordination agreement Georgia–Pacific signed did not include a specific loan amount.[7]

Georgia–Pacific's claim that First Wisconsin's $500,000 loan to West DuPage was in violation of the subordination agreement is also without merit. Although its argument is unclear, Georgia–Pacific appears to contend that the West DuPage loan was actually a disguised loan to DuPage and violated the subordination agreement because the loan was in excess of the alleged lending limits in the First Wisconsin–DuPage loan.[8] Even if the West DuPage loan had exceeded lending limits, the $500,000 loan was not a violation of the subordination agreement. As discussed above, the subordination agreement contained no limits on the amount of loans First Wisconsin could make to DuPage.

■ Next we address Georgia–Pacific's allegation that First Wisconsin breached the subordination agreement by failing to sell DuPage's collateral in a commercially reasonable manner, as required by U.C.C. § 9–504. A secured party after default may sell all of the collateral by public or private proceedings. Ill.Ann.Stat. ch. 26, § 9–504(1), (3) (Smith–Hurd 1974). Every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Ch. 26, § 9–504(3). Notification of the sale must be sent to any other secured party from

---

   may now have or may hereafter acquire in all of the following described property of [DuPage]....

**6.** Note that while we need only look at the terms of the subordination agreement, even if we turned to the loan agreement itself, First Wisconsin had the authority to adjust the ratios and terms of the loan agreement.

**7.** The other case cited by Georgia–Pacific, *Walter E. Heller Western, Inc. v. Tecrim Corp.,* 196 Cal.App.3d 149, 241 Cal.Rptr. 677 (1987) is also distinguishable from the case at hand. Unlike the subordination agreement entered into by Georgia–Pacific, the terms of the subordination agreement in *Tecrim* were unclear and ambigu-

ous. Therefore, the court was required to go beyond the face of the agreement and review circumstances surrounding its execution. *Id.* 241 Cal.Rptr. at 681.

**8.** Georgia–Pacific further claims that First Wisconsin violated the subordination agreement when DuPage guaranteed the West DuPage loan. We see no basis for such a conclusion and Georgia–Pacific has not provided any explanation or evidence as to how that guarantee violated the subordination agreement. Further, as First Wisconsin correctly argues, DuPage's guarantee is a contingent liability and is covered by the subordination agreement. *See In Re Estate of Steagall,* 111 Ill.App.3d 992, 993, 67 Ill.Dec. 602, 603, 444 N.E.2d 838, 839 (1983).

whom the secured party has received written notice of a claim of an interest in the collateral. The secured party may purchase the collateral at a public sale, if the collateral is the type sold in a recognized market. Ch. 26 § 9–504(3).

■ After DuPage defaulted on the loan agreement, First Wisconsin, the first secured party, held a sale of the collateral at a public auction. Georgia–Pacific was provided with notice of the sale, and all potential buyers, including Georgia–Pacific, were given the opportunity to inspect the inventory the weekend prior to the sale. Representatives from Georgia–Pacific were present at the auction. First Wisconsin purchased the accounts for $500,000 and the inventory for $120,000. First Wisconsin subsequently sold the accounts and inventory for an amount greater than what it paid, but less than the loan amount due from DuPage. This excess was credited against DuPage's obligations to First Wisconsin.

The sale of the collateral was commercially reasonable. Not only did First Wisconsin abide by all of the procedural requirements of § 9–504, such as proper notification and advertising, but the sale itself was commercially reasonable because it was conducted by a professional auctioneer who had familiarized himself with the collateral, several bidders were present at the auction, and potential buyers were permitted to examine the inventory the weekend prior to the auction. In addition, First Wisconsin credited DuPage's debt obligation with the additional proceeds generated by First Wisconsin's subsequent sale of the accounts and inventory, even though there was no such requirement in the U.C.C. In effect, First Wisconsin placed DuPage in the same position as it would have been had the final amount received from the ultimate purchaser been received at the auction. *Commercial Discount Corp. v.*

*King,* 515 F.Supp. 988, 992 fn. 5 (N.D.Ill. 1981) (finding that procedure of crediting the debtor for additional proceeds generated by subsequent private resale "eliminate[d] potential arguments of chilled bidding or other breaches of fiduciary duties").

■ Georgia–Pacific argues that the price paid in an auction is the "key component" in assessing the commercial reasonableness of the sale and that First Wisconsin paid too low a price for the inventory and accounts. *Standard Bank & Trust Co. v. Callaghan,* 177 Ill.App.3d 973, 976–77, 127 Ill.Dec. 186, 189, 532 N.E.2d 1015, 1018 (1988). Georgia–Pacific, however, provides no evidence to demonstrate that the price was too low. Georgia–Pacific's claim that First Wisconsin's bid was "only 15 percent of the claimed value of the inventory and 25 percent of the 'book value' the accounts receivable" is not enough (plf. memo. at 21). Rather, plaintiff must give us some evidence that the claimed value or book value represented actual value, or plaintiff must demonstrate that a price of 15 percent and 25 percent of the collateral's book value was not reasonable at a forced sale. *Callaghan,* 177 Ill.App.3d at 977, 127 Ill.Dec. at 189, 532 N.E.2d at 1018 (observing that "[i]n determining whether price is commercially reasonable, Illinois courts have long recognized that property does not bring its full value at forced sales"). And, even if the price paid by First Wisconsin had been too low, Georgia–Pacific would not have been prejudiced because the resale proceeds were offset against DuPage's obligations, which were less than the amount owed First Wisconsin.[9]

Finally, even though price is the key component in assessing commercial reasonableness, it is in itself "insufficient to establish the sale was not made in a commer-

---

**9.** The final resale price, therefore, was the amount offset against DuPage's loan obligations. Georgia–Pacific would have been prejudiced only if the *final* amount collected had been too low and, only if Georgia–Pacific had demonstrated that a different auction procedure would have produced a higher return than the amount ultimately credited against DuPage's debt. We mention that here only to stress that by First Wisconsin crediting DuPage for the excess amount received on resale, any potential for obtaining too low a price was essentially nullified.

cially reasonable manner." [10] *Louis Zahn Drug Co. v. Bank of Oak Brook Terrace,* 95 Ill.App.3d 435, 442, 50 Ill.Dec. 959, 964, 420 N.E.2d 276, 281 (1981). Georgia-Pacific has provided us with no other evidence to demonstrate that the sale was anything but commercially reasonable.[11]

[redacted] We briefly address Georgia-Pacific's remaining allegations that First Wisconsin breached the subordination agreement. First, Georgia-Pacific claims it had the right to receive an accounting from First Wisconsin. We disagree. U.C.C. section 9-504(2) provides that the "secured party must account to the debtor for any surplus." Georgia-Pacific was not a secured party, but a junior secured creditor. More importantly, there was no surplus to account for since the funds realized at the auction were less than the amount of DuPage's indebtedness. *See Zahn,* 95 Ill. App.3d at 442, 50 Ill.Dec. at 964, 420 N.E.2d at 281.

[redacted] Second, Georgia-Pacific argues that First Wisconsin's agent, Green, failed to pursue adequately the collection of the accounts. This argument also is without merit. Georgia-Pacific provides no evidence that would indicate Green did not diligently pursue collection or that Green's participation in collection diminished the amount of money received for the collateral. Further, Green became involved *after* the U.C.C. sale, at which time the security interest of Georgia-Pacific already had been discharged and First Wisconsin, as the U.C.C. purchaser, had taken the collateral "free of all such rights and interests." Ch. 26 § 9-504(4).

B. *Breach of Fiduciary Duty*

[redacted] In count IV of its second amended complaint, Georgia-Pacific claims that it became a surety or guarantor to First Wisconsin by virtue of the subordination agreement and, therefore, that First Wisconsin had fiduciary obligations not to "hinder, delay, injure or release [Georgia-Pacific's] security or its ability to collect or secure the DuPage indebtedness" (plf. 2d am. cplt. at 18). Georgia-Pacific rattles off numerous acts which First Wisconsin allegedly engaged in to support its position that there was a breach of fiduciary duty. Without addressing each of those, we simply focus on whether First Wisconsin had any fiduciary duty to Georgia-Pacific other than selling the collateral in a commercially reasonable manner. We hold that it did not.

First Wisconsin disposed of the collateral in a commercially reasonable manner as required by statute and, thereby, fulfilled any obligations, fiduciary or otherwise, it owed to Georgia-Pacific as a junior creditor. While Georgia-Pacific alleges that First Wisconsin was required to do more than conduct a commercially reasonable sale, we do not believe that to be true. Georgia-Pacific has provided no evidence or support which would lead us to conclude otherwise.

## CONCLUSION

Georgia-Pacific has not proffered sufficient evidence to create a genuine issue of material fact that First Wisconsin breached the subordination agreement or its fiducia-

10. We observe that the failure of Georgia-Pacific's representative at the auction to bid or object that the price was too low suggests that the sale was, indeed, reasonable. *See e.g. Callaghan,* 177 Ill.App.3d at 978, 127 Ill.Dec. at 190, 532 N.E.2d at 1019 (stating that factor in determining commercial reasonableness was that debtor was at sale and objected that price was too low).

11. Georgia-Pacific argues that First Wisconsin failed to obtain an accurate appraisal of the inventory and accounts, thus supporting its allegation that the sale was not commercially reasonable (plf. memo. at 20). However, the U.C.C., does not require the seller to perform a formal appraisal of the collateral and, Georgia-Pacific mentions no case law in support of its argument.

Georgia-Pacific further maintains that Gronik opened the bidding at too low of price (plf. memo. at 21-22). Yet plaintiff provides no support indicating what a reasonable opening bid would have been and, in fact, gives us no evidence that the starting point was too low. Further, even if the opening bid was low that would not necessarily affect the final sale price of the collateral or make the sale commercially unreasonable.

ry duty. We therefore grant First Wisconsin's motion for summary judgment.